STAFFORD METAL WORKS, INC.,
a corporation,

Continental Casualty Company,
Intervenor,

v.

COOK PAINT AND VARNISH CO.,
a corporation.

Civ. A. No. 4–2341.

United States District Court,
N. D. Texas,
Fort Worth Division.

June 28, 1976.

William B. David, Cantey, Hanger, Gooch, Cravens & Munn, Fort Worth, Tex., for intervenor as subrogee-plaintiff.

Beale Dean, Fort Worth, Tex., for intervenor as third-party defendant.

Royal H. Brin, Jr., Mark Martin, Strasburger, Price, Kelton, Martin & Unis, Dallas, Tex., for Cook Paint and Varnish Co.

MEMORANDUM AND ORDER
OF DISMISSAL

MAHON, District Judge.

There is now before the Court Defendant's Motion to Dismiss of 23 March 1976.

This motion came on for hearing before the Court on oral argument on 10 June 1976. In addition to oral argument, the Court has before it several briefs and memoranda filed by all present parties to this action. Having carefully considered all these sources of legal edification, the Court is of the opinion that Defendant's Motion to Dismiss should be granted.

## I.

A brief description of the procedural history leading to the current posture of this case is necessary to understanding how this Motion to Dismiss arose.

On 30 July 1973, Stafford Metal Works, Inc., [hereinafter "Stafford"], filed its complaint based on negligence and products liability. Stafford claims that Cook Paint and Varnish Company [hereinafter "Cook"] supplied it with defective urethane foam insulation which caused a fire in Stafford's plant and resulted in extensive property damage. This suit placed Continental Casualty Co. [hereinafter "Continental"] in the unfortunate position of being at the same time the fire insurer for Plaintiff Stafford and the liability insurance carrier for Defendant Cook.

Under the insurance policies then in force, Continental paid Stafford the sum of $145,228.47 on its property losses due to fire. On 15 October 1973, Continental filed its complaint in intervention, subrogating itself to Stafford for the amount paid under the policy of fire insurance.

Under the terms of the liability insurance policy in force between Continental and Cook, Continental insured Cook for its liability resulting from property damage up to the amount of $100,000.00 for each incident and agreed to defend Cook in any suit seeking damages from Cook on account of property damage. Continental acknowledged its obligation and undertook the defense of Cook against Stafford, employing attorneys for that purpose.

Thus Continental was simultaneously defending Cook as its insured and asserting liability against Cook by way of subrogation for the amount paid to Stafford. Continental employed different attorneys to represent Cook than those it used to represent itself on subrogation. Continental claims that all files were kept entirely separate as between the defense and prosecution of this action and that it acted at all times in good faith with regard to the fiduciary duty it owed Cook.

Thereafter, Continental, as the liability insurer and defender of Cook, settled with Stafford for $163,774.36, the amount of Stafford's original claim in excess of Continental's own subrogation interest in Stafford's fire loss. This settlement exhausted Continental's liability policy with Cook and required the payment by Cook of the amount of $63,774.36 over the policy limits. Stafford then moved to be dismissed from this action, and on 31 October 1974, this Court granted Stafford's motion. Stafford's dismissal left pending only the action by Continental itself as Stafford's subrogee against its liability-insured Cook. Continental, having exhausted the monetary limits of its policy with Cook, and having fulfilled its obligation to defend Cook, withdrew from Cook's defense. Cook then employed attorneys of its own to continue its defense against its insurer Continental.

Various motions of the parties having accumulated the Court ordered a conference on all outstanding motions on 11 March 1976. At that conference it was decided that the case should proceed in three stages: (1) a hearing on Cook's Motion to Dismiss on the grounds that Continental, as an insurer of Cook, lacked standing to sue its own insured; (2) a hearing on Cook's Motion for Summary Judgment (not yet filed) on the question of whether Continental actually exercised good faith in handling Cook's defense; and (3) trial on the merits of the products liability claim (Continental's Motion for Separate Trials having been mooted by the determination to have summary judgment disposition of Cook's counterclaim as to good faith). In accordance with the Court's determination, briefs were filed with respect to the motion to dismiss, and the 10 June 1976 hearing was held on the matter of dismissal.

## II.

■ It is a well established general principal of equity that an insurer cannot subrogate itself against its own insured where the injury was caused by the negligence of the insured himself. *Phoenix Insurance Co. v. Erie & Western Transportation Co.,* 117 U.S. 312, 320–325, 6 S.Ct. 750, 29 L.Ed. 873 (1886); *Federal Insurance Co. v. Tamiami Trail Tours, Inc.,* 117 F.2d 794, 796 (5th Cir. 1941); 46 C.J.S. *Insurance* § 1209 at 154 (1946 & Supp.1975) & cases cited therein at n.13.

■ Subrogation is a purely equitable doctrine and remedy which is logically intertwined with the collateral source rule. It allows the person who pays the loss or satisfies the claim of another person under a legally cognizable obligation or interest to substitute himself for that other person and assert his rights. *Aetna Life Insurance Co. v. Middleport,* 124 U.S. 534, 549, 8 S.Ct. 625, 31 L.Ed. 537 (1888); D. Dobbs, Handbook on the Law of Remedies §§ 4.3 & 8.10 (1973). There are at least three equitable reasons traditionally advanced for permitting subrogation: (1) that the person who in good faith pays the debt or obligation of another has equitably purchased (quasi-contractually), or is at least entitled to, the obligation owed by the debtor or tortfeasor; (2) that the wrongdoer (tortfeasor) is not entitled to a windfall release from his obligation simply because the injured party had the foresight to obtain insurance; and (3) that public policy is served by allowing insurers to recover and thus reduce insurance rates generally.

There are several reasons, however, for not allowing an insurer to recover against his own insured that have traditionally been held to outweigh the general policy in favor of subrogation.

■ (1) The first reason is primarily conceptual. The insurer who subrogates himself to his insured stands in the shoes of his insured and can take nothing by subrogation but the rights of the insured. *Phoenix, supra,* 117 U.S. at 321, 6 S.Ct. 750; Dobbs, *supra,* § 4.3. Thus, there can be no subrogation where the insured has no cause of action against the defendant to a lawsuit. *International Insurance Co. v. Medical-Professional Bldg. of Corpus Christi,* 405 S.W.2d 867, 869 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n. r. e.). Since a person could not bring an action against himself for damages, neither can an insurer who would subrogate himself to that person.

(2) The second reason is more important and based on more practical public policy grounds. The very nature and existence of insurance revolves around understanding and manipulating the concept of risk: risk management, risk control, risk transference, risk distribution, risk retention, etc. *See* R. Keeton, Basic Text on Insurance Law § 1.2 (1971).

> An overwhelming percentage of all insurable losses sustained because of fire can be directly traced to some act or acts of negligence. . . . It is in full appreciation of these conditions that the property owner seeks insurance, and it is after painstaking analysis of them that the insurer fixes his premium and issues the policies. It is in recognition of this practice that the law requires the insurer to assume the risk of the negligence of the insured and permits recovery by an insured whose negligence proximately caused the loss. [noting *Phoenix, supra,* 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873].

*Tamiami, supra,* 117 F.2d at 796.

The remaining reasons commonly given are also based on public policy. (3) The fiduciary relationship between insurer and insured is fraught with conflicting interests. *See Employees Casualty Co. v. Tilley,* 496 S.W.2d 552, 557–561 (Tex.1973). It is thought that allowing the insurer to sue his own insured would upset this tenuous relationship. (4) Additionally, because of the fiduciary relationship, the insurer would be able to secure information from its insured under guise of policy provisions available for later use in a subrogation action against the insured. *Home Insurance Co. v. Pinski Bros.,* 160 Mont. 219, 500 P.2d 945, 948–949 (1972). (5) Finally, the right to sue his own

insured could be interpreted by an insurer as judicial sanction to breach the policy of insurance. *See Pinski, supra,* 500 P.2d at 948–949.

It appears that the only case in any jurisdiction directly in point to the present fact situation [1] is *Pinski, supra,* 500 P.2d 945, a 1972 decision by the Supreme Court of Montana. In that case, Home Insurance Co. paid off a property damage loss of approximately $135,000 that resulted from a boiler explosion at the Montana Deaconess Hospital. Home Insurance Co. then claimed subrogation to the rights of the Hospital against those allegedly responsible. Home Insurance Co. settled with all the defendants except a firm of architects who had a $25,000 comprehensive liability insurance policy with Home Indemnity Co., a wholly owned subsidiary of Home Insurance Co. Home Indemnity Co. had refused to defend the firm of architects in the lawsuit. The Court in *Pinski* held that the insurer had no subrogation rights against its own liability policy insured for a property damage loss it paid another insured under a fire and extended coverage policy. The *Pinski* Court stated:

> There is yet a further and perhaps more cogent reason why summary judgment for the architects on Home's complaint against them is correct. Here, it is undisputed that the architects have insurance coverage to the extent of $25,000 under their Home Indemnity comprehensive liability policy; that Home Indemnity and Home Insurance are one and the same corporate entity; that Home as a

subrogated insurer of one of its policyholders (the Deaconess Hospital) has sued another of its policyholders (the architects) whom it has insured against the very liability for which it seeks recovery in Count I of its complaint in an amount in excess of the policy limits.

Subrogation is an equitable right. . . . Accordingly, certain equity principles apply in determining subrogation rights: One who seeks equity must do equity . . . . One who seeks equity must come into court with clean hands . . . . "No one can take advantage of his own wrong." . . .

To permit the insurer to sue its own insured for a liability covered by the insurance policy would violate these basic equity principles, as well as violate sound public policy. Such action, if permitted, would (1) allow the insurer to expend premiums collected from its insured to secure a judgment against the same insured on a risk insured against; (2) give judicial sanction to the breach of the insurance policy by the insurer; (3) permit the insurer to secure information from its insured under the guise of policy provisions available for later use in the insurer's subrogation action against its own insured; (4) allow the insurer to take advantage of its conduct and conflict of interest with its insured; and (5) constitute judicial approval of a breach of the insurer's relationship with its own insured.

No right of subrogation can arise in favor of an insurer against his own in-

---

1. Continental and Cook have both cited other cases that support their respective positions by analogy. Of these, the ones that are closest to the present fact situation are those involving "builder's risk" policies, wherein a contractor's policy of insurance also covers property belonging to subcontractors, one of whom causes the loss. Cook cites cases that have held that since the negligent subcontractor is an insured, the insurer cannot recover from him. *Transamerica Insurance Co. v. Gage Plumbing & Heating Co.,* 433 F.2d 1051 (10th Cir. 1970); *New Amsterdam Casualty Co. v. Homans-Kohler, Inc.,* 305 F.Supp. 1017 (D.R.I.1969), 310 F.Supp. 374 (D.R.I.1970), *modified & aff'd,* 435 F.2d 1232 (1st Cir. 1970); *Louisiana Fire Insur-*

ance *Co. v. Ballard,* 148 So.2d 865 (La.App. 1963). Continental cites other "builder's risk" cases reaching the opposite result. *McBroome-Bennett Plumbing, Inc., v. Villa France, Inc.,* 515 S.W.2d 32 (Tex.Civ.App.—Dallas 1974, writ ref'd n. r. e.); *Paul Tishman & Co. v. Carney & Del Guidice, Inc.,* 320 N.Y.S.2d 396 (Sup.Ct.1971), *aff'd,* 34 N.Y.2d 941, 359 N.Y. S.2d 561 (Ct.App.1974); *Employer's Fire Insurance Co. v. Behrenin,* 275 F.Supp. 399 (D.Colo. 1967).

The Court is of the opinion that even these cases are properly distinguishable from the present situation for reasons set forth in the discussion of the *McBroome* decision *infra* in the text.

sured since, by definition, subrogation exists only with respect to rights of the insurer against third persons to whom the insurer owes no duty. . . .

500 P.2d at 948–949.

Of course, since this is a case arising under diversity jurisdiction, the Court is bound to apply the law of the State of Texas in which it sits. *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Byrd v. Blue Ridge Rural Electrical Cooperative, Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958).

It is evident that Texas follows the general equitable rule that an insurer may not proceed against his own insured in a subrogation action. *McBroome-Bennett Plumbing, Inc. v. Villa France, Inc.,* 515 S.W.2d 32, 36 (Tex.Civ.App.—Dallas 1974, writ ref'd n. r. e.).[2]

Continental argues, however, that Texas courts would not follow this policy to the extent that the *Pinski* Court did. Instead, Continental asserts, a Texas court would look at the "reality" of the situation as did the Court in *McBroome, supra,* 515 S.W.2d 32, and would allow the insurer to subrogate himself to the claim of one insured against another to the extent that the claim of the former was in excess of the coverage owed the latter. Further, Continental argues that the facts of this case create different policy considerations that take the case out from under the general rule that an insurer cannot sue his own insured.

The Court, however, is of the opinion that the *McBroome* decision does not stand for the proposition for which Continental cites it. The Court in *McBroome,* a "builder's risk" case, ultimately held that an insurer could properly bring a subrogation action in the name of his insured, the owner and general contractor of an apartment house under construction, against a subcontractor for damages sustained in a fire occasioned by the negligence of the subcontractor, even though the subcontractor's equipment

was covered by the insurer's policy with the general contractor. After stating the general rule that an insurer cannot sue his own insured, the *McBroome* Court considered "the realities of the case." 515 S.W.2d at 37. The reality that the Court there found was that the subcontractor's property was not covered by that particular "builder's risk" policy; only the liability of the general contractor to the subcontractor was covered. Indeed, the Court there summarized its holding as follows:

> . . . We hold that the subcontractor McBroome-Bennett was not an assured under the insurance policy issued to Villa France [the owner and general contractor], and accordingly we affirm the judgment of the trial court.

515 S.W.2d at 35.

The *McBroome* Court went on and held alternatively:

> [Even i]f we assume that the property interest of the subcontractor is such as to constitute the subcontractor as an insured under . . . [the insurance] policy, then the realities of the case would demand that such subcontractor be denominated a limited insured or special insured, but certainly not such an insured as would place it in the same legal status as . . . [the general contractor and owner]. . . . [T]he subcontractor would be considered an insured *only to the extent of his limited interest in the tools and property* that he has at the construction site and would not be protected from his· negligence which causes loss to other property beyond his interests and covered by the policy. This attitude and construction would more reasonably comport with equity and good business ·practice as well as the well-settled principles of law above enumerated. Nor would this seem to be a harsh limitation in view of the fact that the subcontractor is not a party to the policy and did not pay premiums or owe any duties to the insurer. Such a result would be far more

---

2. "An insurance company, having paid a loss to its own named insured, may not proceed against its own insured in a subrogation action." 515 S.W.2d at 36.

in line with the obvious intent of the parties.

515 S.W.2d at 39–40.

In sum, the majority opinion in *McBroome* concedes that an insurer normally cannot recover on a subrogation claim against its own insured, but takes the position that even if the subcontractor were insured under the contract in question to the extent of its tools and its work destroyed by the fire, it was not insured for the damage negligently caused to the property of the owner and general contractor, and, therefore, that the insurer would be subrogated to the owner's claim against the subcontractor for loss of the insured property.

Continental argues that the *McBroome* decision stands for the proposition that an insurer, under any circumstances, can subrogate under the claim of one insured against another for that amount exceeding the liability insurance coverage of the negligent insured. The case does not stand for any such proposition.

The primary holding of the *McBroome* majority involves only an interpretation of the language in "builder's risk" policies—*i. e.,* whether the policy covered the subcontractor's property or the general contractor's liability.

The alternative holding in *McBroome* is based not merely on the difference in amount of coverage, but also on the type or quality of coverage provided the two insureds, the relationship of the subcontractor to the insurer, and the intent of the parties in forming the insurance contract. The rationale of the Court in *McBroome* clearly rules out the possibility that a mere discrepancy in the monetary amount of recovery would be sufficient to allow an insurer to subrogate against his own insured.

In short, *McBroome* is a limited decision dealing with a particular type of insurance policy. There are no Texas cases in point that lead this Court to believe that a Texas court would abandon the traditional prohibition against an insurer suing his own insured under the circumstances of the present case.[3]

■ Nor can Continental effectively distinguish the present factual situation on policy grounds. It is true that by having fully complied with the limits of its policy with Cook and now suing its own insured through another insured, Continental has overcome the conceptual problem of the insurer standing in the shoes of the insured. Continental can now treat Cook as a third party to which it owes no more obligation other than a continuing duty of good faith.[4] Nevertheless, the remaining policy arguments still require upholding the traditional rule.

Continental argues that public policy favors allowing it to subrogate to Stafford's claim against Cook. Continental claims that such subrogation would avoid a windfall to Cook, who is the wrongdoer in this action, would avoid the necessity of Continental's imposing higher rates to compensate for its losses, and would realistically deal with the situation of ever increasing incidence where one of the large insurance companies finds that it has insured both sides to an accident and "meets itself at the top." ·

The well-worn traditional policy of avoiding a windfall to the wrongdoer is the most often asserted justification for allowing subrogation. Here, Continental asserts

---

**3.** With regard to the other two cases relied on by Continental, both from other jurisdictions, the *Tishman, supra* n.1, case is substantially similar in rationale to *McBroome. Behunin, supra* n.1, is also similar to *McBroome,* although the Court in *Behunin* seems to have held that the arrangement there was equivalent to separate contracts between the insurer and each of the subcontractors. In short, neither case really supports Continental's position.

**4.** *But cf. Tamiami, supra,* 117 F.2d at 796:

. . . The doctrine of subrogation is based upon principles of natural justice; it is created to afford relief to those required, as insurers, to pay a legal obligation which ought to have been met, either wholly or partially by another.

Aside from the appellant's failure to pay, there is no room to subrogate the insurer to the rights of one insured to defeat another insured in the face of an undertaking to insure both.

. . . .

that Cook will get $145,228.47 worth of insurance for which it did not pay. This, however, is not a positive windfall, but merely a question of who is to assume responsibility for a certain loss. Since this is a products liability case under the laws of the State of Texas, the principal basis of action is strict liability, not negligence. The concept of strict liability negates any notion of moral fault or equitable wrongdoing and robs the "windfall" argument of its traditional validity. Dobbs, *supra*, § 8.10 at 586–587. *See* W. Prosser, Handbook of the Law of Torts § 75 at 492–494 (1971); Keeton, *Products Liability—Liability Without Fault and the Requirement of a Defect,* 41 Texas L.Rev. 855 (1963); *McDevitt v. Standard Oil Co.,* 391 F.2d 364, 370 (5th Cir. 1968). Indeed, one of the underlying policies of strict liability is the need to allocate "a more or less inevitable loss to be charged against a complex and dangerous civilization, and liability is imposed upon the party best able to shoulder it." Prosser, *supra,* § 75 at 495. *See* Keeton, *supra,* 41 Texas L.Rev. 855. Insurance would clearly appear to be the best method by which to dispose of such losses.

Continental argued to the Court at the conference on 11 March 1976 that this action is really one between two insurers, Continental and Cook's excess liability insurer. This aspect of this suit points up the fallacy of Continental's argument concerning rates. Since the loss, no matter which insurance company bears it, must be compensated for by increased premiums, it makes no difference as a matter of public policy whether Continental or the excess liability carrier bears the loss. Public policy is influenced, however, by whether Continental is allowed to subrogate. Such subrogation creates administrative costs in shifting the loss between insurance carriers, which costs must be borne by the public in the form of increased insurance rates. Dobbs, *supra,* § 8.10 at 585–586. Clearly, minimizing such costs is in the public interest. *See generally* Kimball & Davis, *The Extension of Insurance Subrogation,* 60 Mich.L.Rev. 841 (1962). Moreover, this type of loss can be handled by allocation of risks. *See* R. Keeton, *supra,* § 1.2.

Continental places great emphasis on the notion that "meeting itself at the top" and bearing a greater loss than it bargained for in its contract of insurance is an anomalous situation. The Court is unimpressed by this argument. It is an historically common occurrence that an insurance company must bear the cost of two injured insureds without the opportunity to subrogate.[5] Insurance companies have borne this risk for years; it is one of the risks that traditionally is figured into rates. In any event, this situation, if it needs to be changed, needs to be dealt with by the State of Texas—either legislatively or judicially. Having determined that Texas law supports the traditional rule that an insurer cannot subrogate against his own insured, this Court is not in a position to forge a new theory of law to deal with the situation.

Additionally, even were this Court to assume that *McBroome, supra,* 515 S.W.2d 32, substantially changed Texas law with regard to property insurance, there is one significant factor, the duty of the insurer to defend its liability insured, present in the case now before the Court that would prevent the application of the *McBroome* principal. The insurance policies involved in *McBroome* were strictly "builder's risk" policies of property insurance; they imposed no obligation on the insurer to defend his insured. Since this is a determination on a motion to dismiss, the Court must assume that Continental acted purely in good faith. Nevertheless, the situation where an insurer attempts to subrogate and sue his own insured, whom he is obligated to defend, gives rise to so many opportunities for conflict of interests or misrepresentation of the insured that public policy commands that the insurer be denied the right to do so. By way of example of areas where serious conflict of interests might arise, the Court notes that Cook's briefs and arguments have contained the following factual allega-

---

5. *E. g.,* an accident between two motorists insured by the same insurance company.

tions:[6] (1) that Continental used its regular Fort Worth counsel to represent it on its subrogation claim, while hiring outside counsel to defend Cook;[7] (2) that while defending Cook, Continental settled with Stafford for the full amount of Stafford's claim—no offer of settlement for a lesser amount was tendered; (3) that no discovery was performed by Continental's attorneys defending Cook; and (4) that when Continental finally surrendered Cook's defense file to Cook's new attorneys after withdrawing from Cook's defense, the file was found to contain nothing more than correspondence.

Though Continental argues that insurance companies must constantly deal with conflicts of interests, the present case presents a unique situation. If an insurer were allowed to subrogate under these circumstances, not only would several new areas of conflicts be opened up, but an entirely new type of conflict of interests would also arise in the possibility that an insurer might play favorites between its insureds. The relationship between the insurer and insured would be thoroughly destroyed. Furthermore, the Court can take judicial notice of the fact that proving a claim of bad faith is a very difficult undertaking. Therefore, where conflicts of interests and opportunities for bad faith proliferate to the extent they do in this situation, public policy demands that the situation not be allowed to arise.

For all of the foregoing reasons, the Court is of the opinion that Continental lacks standing to sue by subrogation to Stafford's claim.

## III.

Accordingly, the Court ORDERS that Defendant Cook's Motion to Dismiss be granted and that the above referenced cause of action be dismissed with prejudice to refiling.

## ORDER

### NUNC PRO TUNC

There is now before the Court Continental Casualty Company's [hereinafter "Continental"] "Motion of Cross-Defendant to Alter or Amend Memorandum and Order of Dismissal" of this Court of 28 June 1976 concerning the cross-action of Cook Paint & Varnish Co. [hereinafter "Cook"].

■ The Court intended in its 28 June 1976 Memorandum and Order of Dismissal to dismiss Cook's cross-action, the Court being of the opinion that the cross-action became moot upon the dismissal of Continental's main action, and counsel for Cook having represented to the Court at the 11 March 1976 hearing that the cross-action would be dismissed if his Motion to Dismiss Continental's claim were granted. Upon rereading the "Memorandum and Order of Dismissal," however, the Court is of the opinion that the Court's intentions are indeed unclearly stated therein. Since the purposes of Continental's motion are, under the circumstances, to clarify the intention of the Court in an earlier order, the Court is of the opinion that a *nunc pro tunc* order to that effect should be entered. *See* 60 C.J.S. Motor Vehicles § 57, *Nunc Pro Tunc Order Generally.*

The Court is also of the opinion that the time for filing notice of appeal in this action should begin running from the date of entry of this Order. This Order constitutes a ruling on a post-judgment motion to amend, and, because of the ambiguity of the 28 June 1976 order, uncertainty as to whether that order was final and appeala-

---

6. The Court intends these factual allegations to serve only as examples of areas where conflicts of interests could become severe. The Court has not heard the factual issues involved in Cook's claim that Continental has actually acted in bad faith. The Court does not intend to intimate in any manner that Continental has acted in any manner other than in the strictest good faith in these circumstances.

7. Continental, of course, is obliged to do this in order to keep separate the prosecution and defense actions. But this becomes a hopeless trap for the insurer, since the very fact of doing so creates an opportunity for other than the strictest good faith and at the very least raises suspicions in the mind of the insured.

ble or interlocutory would constitute excusable error. Federal Rules of Appellate Procedure, Rule 4(a).

Accordingly, the Court ORDERS that the 28 June 1976 "Memorandum and Order of Dismissal" in the above-referenced cause of action be clarified and amended *nunc pro tunc* so that part III thereof shall read:

Accordingly, the Court orders that Defendant Cook's Motion to Dismiss be granted and that the above-referenced cause of action, including Intervenor's subrogation claim against Defendant Cook and Defendant Cook's counterclaim against Continental Casualty Company, be dismissed with prejudice to refiling.

The Court further ORDERS that the time for filing notice of appeal in this action shall begin to run from the date of entry of this Order.