903 F.2d 871
 1990 A.M.C. 2021, 16 Fed.R.Serv.3d 422
 FARR MAN & CO., INC., et al., Plaintiffs, Appellees,
v.
M/V ROZITA, etc., et al., Defendants, Appellees,
Appeal of AMSTAR CORPORATION, Intervening Plaintiff.
Appeal of FARR MAN & CO., INC., et al., Plaintiffs.
AMSTAR CORPORATION, Intervening Plaintiff, Appellee,
v.
M/V ROZITA, etc., et al., Defendants, Appellees.
 Nos. 89-1640, 89-1641.
 United States Court of Appeals,
First Circuit.
 Heard Dec. 6, 1989.
Decided May 22, 1990.
 
 Bertram E. Snyder, with whom Susan F. Drogin and Looney & Grossman, were on brief, for Amstar Corp.
 Thomas J. Muzyka, with whom Robert E. Collins and Clinton & Muzyka, P.C., were on brief, for Farr Man & Co., Inc.
 Richard B. Kydd, with whom Kneeland, Kydd & Handy, was on brief, for the M/V ROZITA.
 Before TORRUELLA and SELYA, Circuit Judges, COFFIN, Senior Circuit Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 Farr Man & Co., Inc., Farr Man International, Inc., Pine Street Trading Corporation, Sugar Chartering, Inc. (hereinafter collectively referred to as "Farr Man") and Woodhouse, Drake and Carey ("Woodhouse") filed the instant action for cargo damage against the M/V ROZITA, in rem, as well as in personam against its owners and managers, Pescadore Maritime, Inc. and Universal Globe, Inc. (hereinafter collectively referred to as "M/V ROZITA"), on December 27, 1985. The Amstar Corporation ("Amstar"), in its capacity as the cargo purchaser, was permitted to enter the action as an intervening plaintiff, and Lloyd's Underwriters ("Lloyd's") was later added as a party plaintiff pursuant to Farr Man/Woodhouse's motion. The litigation essentially revolved around the issue of the proper allocation of responsibility and liability for cargo damage.
 
 
 2
 The present appeal arises from the district court's actions in vacating its order granting summary judgment in Farr Man/Woodhouse's favor, dissolving the security posted by M/V ROZITA, granting M/V ROZITA's motion for summary judgment, granting Farr Man/Woodhouse's motion to amend its complaint to add Lloyd's Underwriters as a party, and ordering judgment for Lloyd's Underwriters against Amstar, together with costs and interest. Although the record is replete with detail, we will outline only those facts necessary to the decision of this case on appeal.
 
 I. BACKGROUND
 
 3
 Farr Man contracted to supply a quantity of bulk raw sugar to Amstar. The contract, known in the industry as a charter party, was a standardized Amstar contract which provided for payment under "C.I.F." terms, meaning that the cost of the sugar, the insurance, and the freight charges were included in the lump sum to be paid by Amstar, the purchaser, although it was Farr Man's responsibility as the seller to make all necessary shipping arrangements.
 
 
 4
 In accordance with these arrangements, approximately 17,000 tons of bulk raw sugar were delivered to the M/V ROZITA on October 10, 1985 in Bombay, India. It is uncontested that, at that time, the sugar was in good order and condition. Pursuant to its contract with Amstar, Farr Man obtained a $25,000,000 cargo open cover insurance policy on the sugar from Lloyd's Underwriters. While the M/V ROZITA was en route to the United States, Farr Man sold half of its ownership interest in the cargo to Woodhouse, and an appropriate endorsement was made on the cargo insurance policy.
 
 
 5
 Approximately two weeks before the M/V ROZITA entered United States waters, Farr Man informed Amstar of the vessel's location. The district court found that, "[i]n response, Amstar notified Farr Man to send the MV [sic] Rozita to Boston. By industry custom, when the buyer 'assigns' a shipment to its ultimate destination, the seller also assigns the title to the buyer." The M/V ROZITA arrived in Boston, as per the agreement, on or about November 29, 1985. Before the cargo was off-loaded, Farr Man/Woodhouse delivered to Amstar the bills of lading, the customs quota eligibility form, and the insurance certificates. The insurance certificates were assigned by Farr Man/Woodhouse to Amstar, making Amstar the named insured under the policy, as well as the owner of the cargo.
 
 
 6
 The discharge operation was performed by Amstar in its capacity as the stevedore, and these operations were covered by a separate insurance policy.[1] During the discharge of the sugar, the bulk raw sugar in one of the ship's holds suffered salt water contamination when a bulldozer driven by an Amstar employee pierced the starboard bulkhead. The district court found that the cargo contamination was caused solely by the negligence of the Amstar employee, who was acting within the scope of his employment. This finding has not been appealed.
 
 
 7
 With regard to title and risk of loss, the charter party provided:
 
 
 8
 11. (A) Title to and risk of loss in the sugar sold hereunder shall pass, except as provided in Subsection (B) below, at the time when all such sugar has been placed in the carrying vessel's hold.... (B) ... [I]n the case of "omnibus" contracts, title shall not pass before assignment of vessel to buyer.
 
 
 9
 It is undisputed that the charter party at issue is an omnibus contract. Thus, according to the terms of the contract, title to the raw sugar passed to Amstar when there was an assignment of the vessel to Amstar. Farr Man/Woodhouse admits that this occurred before the M/V ROZITA arrived in Boston, before the sugar was damaged during unloading, and before Farr Man/Woodhouse filed suit. Amstar contends that it never authorized Farr Man/Woodhouse to take any action on Amstar's behalf against the M/V ROZITA for cargo damage.
 
 
 10
 Pursuant to the terms of the charter party, pro forma payments totaling $7,541,982--representing 95% of the contract's total value--were made to Farr Man/Woodhouse by Amstar on or before December 9, 1985. Amstar subsequently paid the remainder of the purchase price to Farr Man/Woodhouse for the sugar it received, but withheld $67,319.56 for wharfage, noncompliance charges, survey fees, water, detention, and equipment repairs. Farr Man/Woodhouse stipulated that $38,084.18 was properly withheld under the terms of the contract, but contended that $29,235.38 was related to the difficulties in unloading as a result of the negligence of the Amstar employee, and should not, therefore, have been withheld.
 
 
 11
 On August 26, 1986, Amstar submitted a claim under the cargo insurance policy to Lloyd's Underwriters for $285,268.63, including the $67,319.56 which it had previously withheld from payment to Farr Man/Woodhouse. By March 30, 1988, Amstar had been paid a total of $215,495.23 by Lloyd's Underwriters. The difference between the amount claimed and the amount paid by Lloyd's Underwriters is equal to the $67,319.56 withheld from payment to Farr Man/Woodhouse, together with certain agency fees.
 
 
 12
 On October 30, 1987, Farr Man/Woodhouse served requests for admissions upon M/V ROZITA. These requests were never answered, and on the basis of these requests being deemed admitted under Rule 36 of the Federal Rules of Civil Procedure, Farr Man/Woodhouse moved for summary judgment against M/V ROZITA. That motion was granted on February 19, 1988. On February 25, 1988, M/V ROZITA moved to vacate the order granting summary judgment, but that motion was denied.
 
 
 13
 On March 29, 1988, a non-jury trial began with regard to the liability for the cargo damage between Amstar, the intervening plaintiff, and M/V ROZITA. Farr Man/Woodhouse was not present at these proceedings, and took no part therein, having previously been granted summary judgment against the vessel. On April 1, 1988, the district court declined to take further action "pending counsels' attempts to ascertain the precise position of the parties." After unsuccessful attempts at settlement, on August 12, 1988, Farr Man/Woodhouse filed a motion for entry of the February 19, 1988 judgment, and that motion was opposed both by Amstar and by M/V ROZITA.
 
 
 14
 Pursuant to a district court order, the parties filed a joint stipulation of facts on October 28, 1988, and Amstar filed a motion for summary judgment in its favor as to all parties. Then, on November 3, 1988, Farr Man/Woodhouse moved to amend its complaint to add Lloyd's Underwriters as a party plaintiff, and on November 4, 1988, M/V ROZITA moved to release or reduce the amounts of security.
 
 
 15
 Finally, on April 12, 1989, the district court found that the cargo damage was caused by the negligence of an Amstar employee. This finding has not been appealed. The district court held that Farr Man/Woodhouse, having been paid in full for the cargo, less deductions which it found to be unrelated to cargo damage, had no interest in the sugar cargo at the time of loss. Thus, the court vacated its initial grant of Farr Man/Woodhouse's motion for summary judgment against M/V ROZITA, dissolved the security posted by M/V ROZITA, granted Farr Man/Woodhouse's motion to add Lloyd's Underwriters as a party, and ordered judgment for Lloyd's Underwriters against Amstar, its insured, in the amount of $215,495.23 plus interest and costs. All other claims, counter-claims, cross claims and third party claims were dismissed. The judgment was entered on April 17, 1989.
 
 
 16
 There are essentially three issues on appeal. The first relates to the power of the district court to vacate its original grant of summary judgment in Farr Man/Woodhouse's favor and the effect of M/V ROZITA's failure to respond to requests for admissions. The second addresses the question of whether an insurer, such as Lloyd's Underwriters, can recover against its own insured, in this case, Amstar. The final issue concerns whether it was proper to allow the release of the security posted by M/V ROZITA. We will address each issue seriatim.
 
 II. DISTRICT COURT'S POWER OF REVERSAL
 
 17
 Farr Man/Woodhouse first contends that, on October 30, 1987, Requests for Admissions were served upon M/V ROZITA. These requests essentially tracked allegations made in the complaint. Farr Man/Woodhouse alleges that M/V ROZITA failed to answer the requests, and that, therefore, the facts as stated in the requests were "conclusively established" pursuant to Rule 36(b). Based upon these "conclusively established" facts, Farr Man/Woodhouse moved for summary judgment against M/V ROZITA on February 2, 1988, and the district court granted the motion by Order of February 19, 1988. Farr Man/Woodhouse was awarded damages in the amount of $285,268.63, together with interest and costs. This order was later vacated by the district court pursuant to Rule 60(b)(6). Farr Man/Woodhouse contends both that the district court erred as a matter of law, and that it abused its discretion in granting relief to M/V ROZITA.
 
 
 18
 A. Propriety of Granting Relief Under Rule 60(b)(6)
 
 
 19
 Clearly, the district court should not have based its decision to vacate the April 19, 1988 order granting summary judgment on Rule 60(b)(6). It is, by this time, well settled that Rule 60 applies only to final judgments.[2] E.g., United States v. Baus, 834 F.2d 1114 (1st Cir.1987); Campos v. Puerto Rico Sun Oil Co., 536 F.2d 970, 972 n. 6 (1st Cir.1976). In this case, because of various motions made by the parties, the district court's initial grant of summary judgment was never certified as a final judgment, and was consequently interlocutory pursuant to Rule 54. On this point, all parties agree.
 
 
 20
 The fact that the district court erred, however, is not dispositive. According to the Rules of Civil Procedure, the error, to merit reversal, must "affect the substantial rights of the parties." Fed.R.Civ.P. 61. In this case, it did not. As an interlocutory order, the order granting summary judgment was subject to the district court's discretionary power to alter it at any time prior to the entry of the final decree. The district court was under no stricture to comply with the requirements of Rule 60(b), and could reconsider the motion for summary judgment as to all issues and parties. E.g., John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 86, 42 S.Ct. 196, 197, 66 L.Ed. 475 (1922); Jusino v. Zayas, 875 F.2d 986, 989 n. 3 (1st Cir.1989); Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 862 (5th Cir.1970). Thus, although the district court's reliance on Rule 60(b) was improper, upon review, we find that it was harmless error because relief could properly have been granted under the inherent powers of a district court to modify an interlocutory order. See Jusino v. Zayas, 875 F.2d 986. That being the case, we conclude that the substantial rights of the parties were not affected by the error, and we will consequently disregard it. See Fed.R.Civ.P. 61.
 
 B. Conclusive Effect of Admissions
 
 21
 Having found that reliance on Rule 60(b) was harmless error, we turn now to the merits of Farr Man/Woodhouse's appeal with regard to the effect of M/V ROZITA's failure to respond to requests for admissions.
 
 
 22
 In this case, by not answering the requests for admissions, M/V ROZITA effectively admitted that Farr Man/Woodhouse suffered a loss in the amount of $285,268.63. See Fed.R.Civ.P. 36(b). The stipulated facts, however, reveal that because of payments made to Farr Man/Woodhouse by Lloyd's Underwriters, Farr Man/Woodhouse suffered at worst a loss of $29,235.38. In making its initial admission, M/V ROZITA argues that it relied on the pleadings and other submissions offered by Farr Man/Woodhouse, which neglected to mention the fact that payments totaling $215,495.23 had already been made to Farr Man/Woodhouse and that Farr Man/Woodhouse has stipulated that $38,084.18 was properly withheld from payment by Amstar.[3] M/V ROZITA argues that, had it been aware that Farr Man/Woodhouse had already been partially compensated, it would not have admitted to damages in the amount of $285,268.63.
 
 
 23
 Although it is true that failure to answer requests for admissions will ordinarily result in the requests being deemed admitted, e.g., Rainbolt v. Johnson, 669 F.2d 767, 768 (D.C.Cir.1981), Rule 36(b) does permit a court to allow admissions to be withdrawn or amended, provided that certain requirements are met. In this case, we find that those requirements were satisfied, and thus that the district court acted appropriately in allowing M/V ROZITA to withdraw its admissions.
 
 
 24
 Rule 36(b) provides, in pertinent part, that:
 
 
 25
 [s]ubject to the provision of Rule 16 governing amendment of a pre-trial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.
 
 
 26
 District courts have considerable discretion over whether to permit withdrawal or amendment of admissions made pursuant to Rule 36. Bergemann v. United States, 820 F.2d 1117 (10th Cir.1987); Brook Village N. Assocs. v. General Elec. Co., 686 F.2d 66, 70 (1st Cir.1982); 4A J. Moore & J. Lucas Moore's Federal Practice p 36-08 at 36-80 (2d ed. 1990). That discretion must, however, be exercised within the parameters drawn by Rule 36(b)'s two-part test. On appeal, this court will review the district court's decision to permit withdrawal of admissions only for abuse of discretion. It is important to note that since trial had begun prior to the request to withdraw the admissions, the district court could grant the motion only if it found that so doing was necessary to prevent manifest injustice.[4] See Brook Village N. Assocs. v. General Electric Co., 686 F.2d at 71. Upon review, we find that the district court successfully surmounted this higher standard, and consequently acted within its discretion in permitting M/V ROZITA to withdraw its admissions.
 
 
 27
 In analyzing whether it was appropriate to permit withdrawal of the admissions, we are guided by the purposes of the Rule, as explicated by the advisory committee's note:
 
 
 28
 Provision is made for withdrawal or amendment of an admission. This provision emphasizes the importance of having the action resolved on the merits, while at the same time assuring each party that justified reliance on an admission in preparation for trial will not operate to his prejudice.
 
 
 29
 Fed.R.Civ.P. 36(b), Advisory Committee's Note. As to the first part of Rule 36(b)'s test, we find that permitting the withdrawal of M/V ROZITA's admissions would "facilitate the development of the case in reaching the truth," 4A J. Moore, supra, p 36-08 at 36-79, because, as the district court noted, the most current stipulation of facts sets the damages suffered by plaintiffs at $29,268.63, rather than the amount admitted to of $285,268.63. Thus, we conclude, the first prong of Rule 36(b) is satisfied. The second hurdle is similarly easily surmounted.
 
 
 30
 Rule 36(b)'s second part essentially requires that, prior to allowing withdrawal of admissions, the district court be convinced that the party who obtained the admission will not be prejudiced by its withdrawal. As this court has previously stated,
 
 
 31
 [t]he prejudice contemplated by the Rule is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth. Rather, it relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions.
 
 
 32
 Brook Village N. Assocs. v. General Elect. Co., 686 F.2d at 70. See Westmoreland v. Triumph Motorcycle Corp., 71 F.R.D. 192 (D.Conn.1976). In the instant case, the district court found that, "[s]ince all the lawyers in the case appear to have been equally (and woefully) ignorant of the facts, there is no unfairness in relieving the defendant of admissions which are conceded to have been incorrect." There is more than sufficient evidence to support this conclusion, particularly in light of M/V ROZITA's uncontroverted claim that it was not until after trial had commenced that it became aware that Farr Man/Woodhouse had been paid $215,495.23 of the $285,268.63 of claimed cargo damage.
 
 
 33
 Upon review, we find that Farr Man/Woodhouse was not prejudiced by the rescission of the admissions as to the total amount of liability--$285,268.63. Allowing that admission to stand would have been manifestly unjust: it would have allowed Farr Man/Woodhouse to collect a double recovery--once from M/V ROZITA, and a second from Lloyd's Underwriters. Indeed, on appeal, Farr Man/Woodhouse does not argue for this result. Instead, it contends that it was damaged in the amount of $29,235.38, and that Lloyd's Underwriters was damaged in the amount of $215,495.25.
 
 
 34
 Although there is sufficient evidence to support the district court's rescission of the admissions as to damages of $215,495.23, that still leaves $69,773.40 unaccounted for. Of that amount, Farr Man/Woodhouse admitted that $38,084.18 was properly withheld and it does not appear to contest the withholding of $2,453.84 for other fees. But that leaves $29,235.38 still in dispute. The district court found that Farr Man/Woodhouse failed to make a claim for the $29,235.38 allegedly wrongfully withheld from payment by Amstar, costs which Farr Man/Woodhouse contends were related to the added difficulty associated with unloading the sugar because of the negligence of the Amstar employee, although the district court concluded that the deductions were unrelated to cargo damage.
 
 
 35
 Upon review of the pleadings, we find that the district court reads them too narrowly. While Farr Man/Woodhouse never specifically mentioned the exact figure of $29,235.38, the loss it claimed was far more than that which it eventually received from Lloyd's Underwriters and which it initially won on summary judgment. Since Farr Man/Woodhouse was never a party to a trial, it did not have the opportunity to present evidence on the issue. Consequently, we find that there is a material issue as to whether Farr Mann had an interest in the cargo, at least to the extent of the $29,235.38 which was withheld from payment. Therefore, we vacate that portion of the district court opinion dismissing Farr Man/Woodhouse's claim as to its alleged loss of $29,235.38, and remand this issue to the district court for trial.
 
 
 36
 III. ABILITY OF AN INSURER TO RECOVER AGAINST ITS INSURED
 
 
 37
 The second issue relates to the ability of an insurer to recover against its own insured. The district court, in ordering judgment for Lloyd's Underwriters, concluded that an insurer which pays a claim for cargo damage can ultimately recover from its own insured when the damage was caused by the insured in its capacity as stevedore. We disagree.
 
 
 38
 In its memorandum and order of April 12, 1989, the district court effectively realigned the parties so as to bring in opposition Lloyd's Underwriters, which paid for the damaged cargo, and Amstar, whose employee caused the damage. Although Lloyd's Underwriters was never formally entered as a plaintiff against Amstar, the issue of whether Lloyd's had a right of recovery against Amstar was the underlying issue in all the briefs, motions, and arguments filed after April 1, 1988. It should be noted that, by making Lloyd's a direct plaintiff, and Amstar a direct defendant, the district court would have made it clear that Lloyd's was suing its own insured. But what cannot be done directly, cannot be done indirectly either.
 
 
 39
 Although Lloyd's Underwriters never filed a claim against Amstar, Farr Man/Woodhouse has consistently argued that Lloyd's was entitled to recovery from Amstar under the "purely equitable doctrine of subrogation." Stafford Metal Works, Inc. v. Cook Paint and Varnish Co., 418 F.Supp. 56, 58 (N.D.Tex.1976). Under that doctrine, "an insurance carrier, upon payment of a loss, becomes subrogated to rights and remedies of its assured to proceed against a party primarily liable without the necessity of any formal assignment or stipulation...." New York Bd. of Fire Underwriters v. Trans Urban Constr. Co., 458 N.Y.S.2d 216, 219, 91 A.D.2d 115, aff'd, 60 N.Y.2d 912, 470 N.Y. S.2d 578, 458 N.E.2d 1255 (1983).[5] See also Bispham, Principles of Equity Sec. 310, at 285 (11th ed. 1931).
 
 
 40
 Farr Man/Woodhouse essentially argues that Amstar is schizophrenic: it is both the sugar owner and the stevedore. As the sugar owner, Farr Man/Woodhouse contends, Amstar was a holder under the certificates of insurance, but Amstar as the stevedore was not. Thus, by making payment to Amstar as the owner of the cargo, Lloyd's Underwriters became subrogated to the rights of the assured against the party which caused the damage--Amstar as the stevedore. Since Amstar was wearing "two hats," and Lloyd's insured the head under only one of them, Farr Man/Woodhouse contends that allowing Lloyd's to recover on its subrogation claim against the other head would not result in Lloyd's making a recovery against its own insured.
 
 
 41
 Pursuant to Section 12 of the charter party, the parties agreed that:
 
 
 42
 (A) Marine ... insurance, with loss payable to buyer [Amstar] from time title and risk of loss passes to buyer [Amstar] and to seller [Farr Man] prior to title and risk of loss passing to buyer [Amstar], shall be procured and maintained by buyer ... at expense of seller, on all sugar sold hereunder. The marine policy shall cover all risk of physical loss or damage from any external cause; shall include customary on-shore coverage until completion of discharge of such sugar at destination port and delivery into warehouse as directed by buyer [Amstar]....
 
 
 43
 From the terms of the contract it is clear that, at the time the cargo damage occurred, Amstar had title to the sugar, and thus was the assured under the cargo insurance policy. It follows then, that the party to whose rights Lloyd's sought to be subrogated was Amstar, and that since the damage was caused by Amstar's negligence, the party against which Lloyd's proceeded was also Amstar.
 
 
 44
 It is well settled that "the equity of subrogation invests the underwriters with the rights of the assured against third persons, not with a right to override its own obligation to the assured." Great Lakes Transit Corp. v. Interstate S.S. Co., 301 U.S. 646, 654, 57 S.Ct. 915, 918, 81 L.Ed. 1318 (1937). Moreover, insurance underwriters cannot "recover back from [their insured] what they have paid to it [and what] they had expressly agreed to pay to [it]." Id. See New Amsterdam Casualty Co. v. Homans-Kohler, Inc., 305 F.Supp. 1017, 1019 (D.R.I.1969), later app., 310 F.Supp. 374 (D.R.I.1970), aff'd, New Amsterdam Casualty Co. v. Holmes, 435 F.2d 1232, 1233-35 (1st Cir.1970). See also Dow Chem. Co. v. M/V Roberta Tabor, 815 F.2d 1037, 1043 (5th Cir.1987). More than one hundred years ago, the Supreme Court provided guidance which, we think, is instructive in this case:
 
 
 45
 The right of action against another person, the equitable interest in which passes to the insurer, being only that which the assured has, it follows that if the assured has no such right of action, none passes to the insurer....
 
 
 46
 ....
 
 
 47
 For instance, if two ships, owned by the same person, come into collision by the fault of the master and crew of the one ship and to the injury of the other, an underwriter who has insured the injured ship, and received an abandonment from the owner, and paid him the amount of the insurance as and for a total loss, acquires thereby no right to recover against the other ship, because the assured, the owner of both ships, could not sue himself.
 
 
 48
 Phoenix Ins. Co. v. Erie Transportation Co., 117 U.S. 312, 321-22, 6 S.Ct. 750, 754, 29 L.Ed. 873 (1886). The insurer is entitled to take by subrogation only the rights of the assured, regardless of whether the loss was total, or, as in this case, partial. Id. at 321, 6 S.Ct. at 753.
 
 
 49
 Although there are doubtless many public policy reasons for prohibiting an insurer from suing its own insured, e.g., Pennsylvania Gen. Ins. Co. v. Austin Powder Co., 68 N.Y.2d 465, 510 N.Y.S.2d 67, 502 N.E.2d 982 (1986) (contrary rule would permit insurer to avoid coverage which insured purchased); Stafford Metal Works, Inc. v. Cook Paint & Varnish Co., 418 F.Supp. at 58 (fiduciary relationship between insured and insurer could create conflict of interest in law suit); Great Lakes Transit Corp. v. Interstate S.S. Co., 301 U.S. at 654, 57 S.Ct. at 918 (prevents an insurer from "overrid[ing] its own obligation to the assured"), we think the law is clear, and not in need of elaboration. The fact that it was the insured whose negligence caused the damage, does not, in our view, abrogate long established doctrine. See New Amsterdam Casualty Co. v. Holmes, 435 F.2d 1232 (1st Cir.1970).
 
 
 50
 Furthermore, the district court found that "[t]he Sugar Contracts, the Charter Party and the Insurance Certificates all indicate that the parties intended Lloyd's to insure the cargo warehouse to warehouse." Nowhere does it state that Amstar would be excluded from coverage under the Lloyd's policy if it acted in the capacity of the stevedore. In view of the Supreme Court's dictates, an insurer contemplating subrogation against its own insured must do so in clear and unequivocal language. See Great Lakes Transit Corp. v. Interstate S.S. Co., 301 U.S. at 654, 57 S.Ct. at 918. This clear exception requirement is not an onerous burden to impose upon an insurer where the contract permits the assured to select the stevedore. In this case, Clause 6 of the charter party provided that:
 
 
 51
 [d]ischarge from vessel of each shipment hereunder shall be made by buyer [Amstar], or its designee, as discharging stevedore....
 
 
 52
 In cases such as this, the insurer assumes the risk that the stevedore operations will be completed by the assured itself, and that damage will occur. See Royal Exch. Assurance of America, Inc. v. SS President Adams, 510 F.Supp. 581, 583 (W.D.Wash.1981); Pennsylvania Gen. Ins. v. Austin Powder Co., 68 N.Y.2d at 470, 510 N.Y.S.2d 67, 502 N.E.2d 982.
 
 
 53
 The district court, for reasons which are unclear to us, relied on Gibbs v. S/S Dona Paz, 96 F.R.D. 599, 600-01 (E.D.Pa.1983), to hold that an insurer "which had paid a claim for cargo damage could ultimately recover from its own insured where the damage was actually caused by the insured in its capacity as stevedore." In so doing, the district court attempted to further a policy of imposing liability in a manner designed to encourage the exercise of due care. But one case cannot withstand the weight of authority pressing this court to move in another direction. It is the rule in this circuit, as elsewhere, that an insurer may not sue its own insured unless clear exceptions to this rule are manifested in the insurance contract. Because those exceptions are not present in the contract at issue here, we reverse the district court's entry of judgment for Lloyd's Underwriters against Amstar in the amount of $215,495.23 plus interest and costs, and direct the entry of Amstar's motion for summary judgment against Lloyd's Underwriters.[6]
 
 IV. RELEASE OF SECURITY
 
 54
 The final issue which this court must address is whether the district court abused its discretion by granting M/V ROZITA's motion to release the $450,000 security bond posted by it. Farr Man/Woodhouse contends that M/V ROZITA has primary liability for the damage caused to Farr Man/Woodhouse, and that retention of the surety is therefore proper.
 
 
 55
 The decision of the district court to release defendant/appellee M/V ROZITA's security is one to which this court will accord great deference, and which we will review only for abuse of discretion. Titan Navigation, Inc. v. Timsco, Inc., 808 F.2d 400 (5th Cir.1987). After reviewing the record, we find no such abuse.
 
 
 56
 The district court committed no reversible error when it held that Farr Man/Woodhouse was not entitled to recovery from M/V ROZITA. Farr Man/Woodhouse contractually assumed the risk for any cargo damage caused by the stevedores, because the charter party provides that the charterer, not the shipowner, is responsible for hiring the stevedore. It is the charterer, not the shipowner, who had control over the performance of loading and discharging activities. Since the district court, in an uncontested ruling, held that the cargo damage was caused solely by the negligence of the stevedore, Amstar, Farr Man/Woodhouse is not entitled to recover from M/V ROZITA for cargo damage caused by Amstar. Therefore, the district court did not abuse its discretion in releasing the security posted by M/V ROZITA, given its findings that M/V ROZITA was not liable for the damages.
 
 V. CONCLUSION
 
 57
 For the reasons discussed above, we hereby vacate that portion of the district court's opinion dismissing Farr Man/Woodhouse's claim as to its alleged loss of $29,235.38 and remand this issue for trial; reverse the district court's entry of judgment for Lloyd's Underwriters against Amstar in the amount of $215,495.23 plus interest and costs; and direct the entry of Amstar's motion for summary judgment against Lloyd's Underwriters. In all other respects, we affirm the decision of the district court.
 
 
 58
 Vacated in part, remanded in part, reversed in part and affirmed in part. Each party to bear its own costs.
 
 
 
 [1]
 The stevedore operations were insured by a separate insurance policy with The Continental Insurance Company. Whether or not the cargo damage was covered under this policy is unclear from the record, but this is not at issue on appeal. Nor has the Continental Insurance Company ever been a party to the instant action
 
 
 [2]
 Indeed, the Advisory Committee Note to the 1948 amendment of Rule 60(b) makes it clear that relief from final judgments under Rule 60(b) is more difficult to obtain than relief from interlocutory judgments
 The addition of the qualifying word 'final' emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.
 Fed.R.Civ.P. 60(b), Advisory Committee's Note.
 
 
 [3]
 No allegation has been made that M/V ROZITA's reliance was improper or negligent
 
 
 [4]
 Rule 36(b) specifies that the power of the district court to permit withdrawal or amendment to admissions is "subject to the provision of Rule 16 governing amendment of a pre-trial order...." Rule 16(e) provides:
 (e) Pretrial Orders. After any conference held pursuant to this rule, an order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.
 Thus, once trial has commenced, a district court has discretion to permit withdrawal or amendment to admissions made pursuant to Rule 36(b) only to prevent "manifest injustice," which is a higher standard than is otherwise imposed. See also 3 J. Moore, supra, p 16.03 at 16-41.
 
 
 [5]
 In insurance law, the "assured" is the person or entity for whose benefit an insurance policy is issued and to whom the policy is payable, while the "insured" is the party whose life or property is insured. Connecticut Mut. Life Insurance Co. v. Luchs, 108 U.S. 498, 2 S.Ct. 949, 27 L.Ed. 800 (1883). Ordinarily, the two terms are synonymous, id. at 504, 2 S.Ct. at 950, and we treat them here as such
 
 
 [6]
 Having concluded thusly, it is immaterial whether or not it was an abuse of discretion, as Amstar alleges, for the district court to have allowed Farr Mann/Woodhouse's motion to add Lloyd's Underwriters as a party plaintiff. As its insured, Amstar is entitled to summary judgment against Lloyd's Underwriters