**SYSTEMIZED OF NEW ENGLAND, INC., Plaintiff, Appellant,**

v.

**SCM, INCORPORATED, Defendant, Appellee.**

**No. 83–1772.**

United States Court of Appeals, First Circuit.

Argued March 9, 1984.

Decided April 27, 1984.

---

Ira L. Schreiber, Providence, R.I., with whom Ralph Gonnella, and Guy R. Bissonnette, Providence, R.I., were on brief, for appellant.

George M. Vetter, Jr., Providence, R.I., with whom Benjamin V. White III, Vetter & White, Providence, R.I., and Peter Dreilinger, New York City, were on brief, for appellee.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

In this commercial case, plaintiff-appellant, Systemized of New England, Inc., makes three claims: breach of contract, breach of the warranty of merchantability in the sale of goods, and violation of the antitrust laws, specifically the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 14. The antitrust claims are premised on a theory of illegal tying. The issues are whether the district court erred in directing a verdict for the defendant-appellee, SCM Corporation (SCM), on the breach of contract and antitrust claims and in granting a judgment notwithstanding the verdict on the breach of warranty claim. We recount the evidence in the light most favorable to the nonmoving party in ruling on the propriety of the district court's grant of directed verdicts and judgment n.o.v.

*The Evidence*

Systemized of New England, Inc. (Systemized) is in the business of selling, supplying, and servicing photocopiers. Its principal place of business is Providence, Rhode Island. SCM Corporation is a New York corporation. During the 1970's SCM marketed several models of photocopiers to its authorized dealers, including Systemized, and also provided photocopiers to businesses and government agencies on a contractual system similar to leasing. These contracts ran between SCM and the users, and contained SCM's promises to maintain and service the equipment. SCM then paid its local dealers to service the photocopiers so provided. Large national companies and government agencies with photocopying needs of 50,000 copies per month were known as K-Accounts. Substantial and reliable monthly cash commissions accrued to the dealers having responsibility for the major K-Accounts, and were not dependent upon the number of service calls made. The dealers' commissions were paid at a flat rate dependent upon the type and number of photocopiers in the K-Account.

During July, 1978, Systemized ordered five of the model 1200 copiers from SCM. After receipt of these machines, Systemized ordered ten more 1200s in September and an additional ten in November of 1978. The last group of SCM 1200s was delivered in early December. Shortly after the new year, Joseph Ryan and John Fitzgerald, the principals of Systemized, were informed by William Curran, the National Retail Sales Manager for SCM, that the Boston SCM photocopier branch was for sale and they expressed an interest in purchasing it. Approximately two weeks later, Ryan and Fitzgerald met with Curran in Boston to discuss the purchase of the Boston branch. At that meeting, Curran told the principals of Systemized that they would have to buy a minimum of ten 1200s and a total minimum of $25,000 worth of equipment and supplies, as a precondition to the purchase of the branch. In response, Ryan told Curran that they did not want to buy any more 1200s. Ryan explained that they had pur-

chased some of these machines as early as July of the previous year and by late fall were experiencing difficulties. The copiers were not functioning properly and were causing numerous customer complaints. Curran's response was that, unless they agreed to place the order as specified, he was unable to begin negotiations or allow them to see the financial worksheets of the branch.

Ryan and Fitzgerald then agreed to the purchase conditions with Ryan admonishing Curran that SCM would have to correct the problems with the 1200 copier. Despite dissatisfaction with the 1200, Systemized fulfilled its entire minimum inventory purchase requirement of $25,000 by purchasing on January 30, 1979, fifteen SCM 1200s, five more 1200s than SCM required as part of start-up branch inventory. At trial, Ryan explained that the branch was overstocked with toners and other supplies; apparently the 1200s constituted the only alternative for fulfilling the inventory requirement because it was the only photocopier SCM was marketing at that time. Systemized then purchased an additional ten 1200s on February 5, 1979. On February 13, 1979, SCM sent a letter to all of its Boston area customers announcing the appointment of Systemized as its dealer and service provider for the area.

Systemized did not purchase additional SCM 1200s after its February order, apparently because SCM introduced a new model, 1201, in the spring of 1979. Although the record is somewhat unclear, it appears that the New England Wholesales Manager, William Pawluk, contacted Systemized about purchasing the 1201s. Ryan and Fitzgerald then sat down with SCM representatives and told them that they were leery about the so-called improvements in the 1201. The SCM people must have been persuasive, however, because Systemized ordered ten 1201s on April 25, 1979. The 1201s failed to perform any better than the 1200s.

On visits during June, July, and August, Pawluk inquired whether Systemized was

interested in purchasing additional 1201s. Each time, beginning in June, Ryan told Pawluk that Systemized did not want to do so because those machines were, in his opinion, as unreliable as the 1200s. Systemized did not place any more orders for 1200s. During Pawluk's July visit, Ryan reiterated Systemized's resolve not to purchase more 1201s. In August, the 1201s were discussed again both with Pawluk and with another SCM executive, Herb Aaron, the regional account manager. According to Ryan, Aaron called the 1201s "pieces of junk" after Ryan informed Aaron that Systemized would not purchase any more 1201s. These three conversations comprise the entire communication from Systemized to SCM regarding the 1201's deficiencies.

Further evidence indicates that Systemized purchased the 1200s for $1,795 and the 1201s at $1,895 per machine. Systemized resold the 1200s at prices ranging from $1,995 to $4,000 per machine, with the majority selling for approximately $3,000. The 1201s, to the extent that they were resold, were sold in the range of $2,600 to $3,100. The average price Systemized received for the photocopiers was below the retail price SCM expected dealers to obtain.

Ryan testified that Systemized had twelve or thirteen of the defective photocopiers in its storeroom at the time of trial; they had been sold but were returned when they failed to live up to customer standards. Besides the returned machines, Systemized was apparently involved in litigation over some of the other 1200s and 1201s, whose description was excluded from evidence. There is no evidence that Systemized made any mention to SCM of these suits prior to the institution of this litigation.

In mid-July, after Ryan had told SCM representatives on at least two different occasions that Systemized would not purchase any more 1201s, Systemized was informed that SCM had been receiving complaints regarding the servicing of K-Account photocopiers. A summit meeting was held at Ryan's request between Aaron, Pawluk, Ryan and Fitzgerald in an attempt to resolve the problems. Apparently no resolution was achieved because SCM initiated inquiries among other dealers in the Boston area to determine whether they would be willing to assume some of Systemized's service work. On December 15, 1979, SCM contacted the Woburn, Massachusetts, branch of Systemized and informed the workers that two-thirds of the Boston area accounts were being transferred from Systemized to other dealers in the area. A significant reduction in Systemized's income resulted from this action.

*Breach of Contract*

Plaintiff Systemized alleges that SCM breached their written contract by unilaterally removing from it two-thirds of the K-Accounts. It contends that its purchase of the Boston branch was predicated on and contained a transfer of the right to service the K-Accounts for valuable consideration. Defendant denies that plaintiff had any contractual right to service the K-Accounts and argues that it had the unilateral right to remove the accounts from plaintiff and transfer them to other dealers.

The parties also differ on which state's law is to be applied in interpreting the contract. Plaintiff submits that because the contract was executed in Massachusetts and concerned the sale of a business located in Massachusetts, the law of Massachusetts should be applied. Defendant points to a passage in the contract by which the parties designated New York law to govern disputes under the contract.

The pertinent contract language states: "15. APPLICABLE LAW. This agreement shall be construed and enforced in accordance with the laws of the state of New York." While plaintiffs would have us apply Massachusetts law, Massachusetts, we believe, would apply New York law. Where the parties to a contract have expressed their intent as to the applicable governing law, Massachusetts has upheld the parties' expectations and looked to that state's law provided that the specified state bears some minimum contact with the transaction. *Maxwell Shapiro Woolen Co.*

*v. Amerotron Corp.,* 339 Mass. 252, 257, 158 N.E.2d 875, 878 (1959). SCM is a New York corporation, a sufficient minimum contact for us to effectuate the parties' intentions and apply New York law on this issue. We agree with the district court that rules governing contracts of adhesion are inapplicable here because the contract documents on their face reveal evidence of bargaining. Moreover, plaintiff's own witnesses testified to effective bargaining on some of SCM's requested terms, and plaintiff was represented by counsel at the closing. We find no countervailing Massachusetts public policy justifying a displacement of the parties' settled expectations regarding the choice of law. *See Dolan v. Mutual Reserve Fund Life Assn.,* 173 Mass. 197, 53 N.E. 398 (1899).

Plaintiff correctly contends that the documents which collectively comprise the contract must be read *in pari materia,* but this point does not further its position. The critical language regarding the K-Accounts is found in paragraph 5(c) which states:

> During the life of the Dealer Agreement, but in no event less than one (1) year after the closing date, Purchaser will provide the maintenance services *which SCM may request,* including, but not limited to, the K and G Accounts which are or will be located in Purchaser's Primary Area of Responsibility ....
> [Emphasis added.]

We agree with the district court that, on its face, this language does not obligate SCM to request any services for K-Accounts. Nor does the Dealer Agreement change this provision. Under the Dealer Agreement, the plaintiff is required to provide service to all SCM accounts in its geographical area as a condition for being an authorized SCM dealer. Under plaintiff's construction, it thereby acquired a guaranteed contractual right to service all Boston area K-Accounts. The conditional "may request" language of the contract quoted above, in plaintiff's view, refers only to the fact that SCM does not guarantee the existence of any K-Accounts. Under this construction, however, the "may request" lan-

guage would be mere surplusage, with no effect whatsoever.

■ We take our guidance from the familiar principle that a court must favor interpretations which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage. *See, e.g., National Equipment Rental, Ltd. v. Reagin,* 338 F.2d 759, 762-63 (2d Cir.1964) (applying New York law); *Looney v. Great American Insurance Co.,* 71 F.R.D. 211, 214 (E.D.N.Y.1976). As the district court noted, there is nothing in the contract or in the several documents comprising the closing contract, which obligates the defendant to permit the plaintiff to service the K-Accounts for as long as those accounts are in existence. It is plain from the testimony of Ryan and his partner that the plaintiff could have bargained for such language, but did not. We also recognize that such a provision would have made it difficult for SCM to enforce a certain standard of service for its customers so that its rental contracts not be endangered, as here, by substandard or tardy service. Finally, we note that the contract documents contain a sweeping integration clause directing that any representations not stated in the documents are superseded and inapplicable. Accordingly, a court, in the absence of ambiguity, must look only to the language of the contract itself to determine the meaning of the contract language.

We can only conclude that upon execution of the contract, Systemized became the owner of an ongoing business, including its goodwill and physical inventory, but did not purchase the right to service the K-Accounts in the Boston area. The district court properly directed a verdict for defendant on this issue.

*Antitrust Claims—Illegal Tying*

■ The district court directed a verdict in defendant's favor on the antitrust tying theories, both of which are appealed here. The first such claim alleged that in order for plaintiff to retain the right to service the K-Accounts, it was required to continue purchasing defective models 1200 and 1201

photocopiers. According to this theory, the K-Accounts constituted the tying product and the photocopiers the tied product, an arrangement which, in its view, violated the Sherman Act, 15 U.S.C. § 1. In its second theory, plaintiff contends that its original purchase of the right to service the K-Accounts formed the tying product and the requirement of purchasing at least ten model 1200 copiers constituted the tied product, in violation of both the Sherman Act, *id.*, and the Clayton Act, 15 U.S.C. § 14. The district court held the proof insufficient as a matter of law to show a proscribed tie under either theory. We agree. Both antitrust claims were keyed to the K-Accounts. We have found that plaintiff had no contractual or purchase rights in these accounts. Moreover it failed to prove "market power in the tying product." *See Jefferson Parish Hospital v. Hyde,* — U.S. —, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

*Breach of Warranty*

In its complaint, plaintiff alleged that the SCM models 1200 and 1201 which had been purchased by Systemized were not fit for their ordinary purpose and that SCM breached the implied warranty of merchantability with respect to this equipment. The defects charged lay in the photocopiers' design which, according to plaintiff's evidence, produced constant paper jams which wasted paper and required that the fragile photosensitive drum be removed to clear the paper. If even the slightest scratch or mar of the drum occurred during this process it had to be replaced at a cost of over $150. Injuries to drums occurred frequently owing to the repetitive paper jams. Copying speed was slow and quality poor. These problems were evaluated by an independent trade publication's laboratory and reports were published in *Buyers*

*Laboratory* in March, 1979, and January, 1980. Although the initial conclusion of the publication was "NOT RECOMMENDED," SCM was able to persuade the laboratory to complete a second evaluation with some modifications in the manner the machine was set up. This second report, which concluded "RECOMMENDED WITH RESERVATIONS NOTED," observed that bad paper supplies had caused a number of the previous problems but that some of the design problems, such as the difficulty in loading paper and in clearing paper jams, remained. Shortly thereafter, SCM began winding down its photocopying equipment division and left that market entirely in June, 1980.

■ The district court set aside a $103,798 verdict in favor of Systemized on the breach of warranty claim and granted judgment notwithstanding the verdict. As the district court correctly observed, a judgment n.o.v. should be granted "only when, as a matter of law, no conclusion but one" can be drawn from the evidence. *Robinson v. Watts Detective Agency,* 685 F.2d 729, 733 (1st Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983), quoting *Rios v. Emperas Lineas Maritimas Argentinas,* 575 F.2d 986, 990 (1st Cir.1978).

■ Plaintiff sets forth a variety of reasons justifying its contention that the district court erred in granting judgment n.o.v. Only one need be discussed here because it is dispositive of the issue. Under the Federal Rules, a judgment n.o.v. is, in effect, a renewal of a motion for a directed verdict made at the conclusion of the evidence. *See* Fed.R.Civ.P. 50(b).[1] A party may not base its motion for a judgment n.o.v. on a ground that was not argued in its motion for a directed verdict. *Martinez Moll v. Levitt & Sons of Puerto*

---

1. Fed.R.Civ.P. 50(b) provides in pertinent part:
   (b) **Motion for Judgment Notwithstanding the Verdict.** Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determina-

tion of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict[.]

*Rico, Inc.*, 583 F.2d 565, 568 (1st Cir.1978); 5A Moore's Federal Practice ¶ 50.08 at 50–86 (1977).

In its motion for a directed verdict on the breach of warranty claim, SCM argued that plaintiff had adduced insufficient proof of the existence of any warranties and of Systemized's reliance on those representations. In its motion for a judgment n.o.v., SCM advanced nine grounds, including the one on which it based its earlier motion for a directed verdict. The district court disposed of that particular argument, however, by ruling that SCM had not effectively disclaimed the express and implied warranties and that, in any event, such a position should have been pleaded and presented as an affirmative defense. As it had not been so pleaded, the district court held SCM to have waived that defense.

■ The district court did find merit, however, in SCM's claim that as a matter of law, Systemized provided insufficient notice to SCM regarding the breach. We note first that the question of adequate notice either generally or per the Uniform Commercial Code § 2–607–3(a) was not adverted to in the slightest degree in defendant's motion for a directed verdict.

The purpose of the Rule 50(b) requirement is to alert the opposing party to the movant's claim of insufficiency before the case goes to the jury, so that his opponent may possibly cure any deficiency in his case should the motion have merit, and also so that the judge may rule on the adequacy of the evidence without impinging on the jury's fact-finding province. *See Sulmeyer v. Coca Cola Co.*, [515 F.2d 835 (5th Cir.1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976)] at 846 n. 17; 5A Moore's Federal Practice ¶ 50.08 at 50–88 (1977).

*Martinez Moll v. Levitt & Sons*, 583 F.2d at 569. *See also Bestway Equipment Services, Inc., v. Berwind Lines, Inc. v. Caribe Tug Corp.*, 655 F.2d 440, 443 (1st Cir. 1981); *Javelin Investment, S.A. v. Ponce*, 645 F.2d 92, 94 (1st Cir.1981). The judgment n.o.v. must be vacated. Interesting-

ly, the district court buttressed its grant of judgment n.o.v. to the defendant by noting that a buyer's failure to provide adequate or timely notice of defects denies the seller the opportunity to cure his breach. Similarly, here, the defendant failed to provide sufficient notice to the plaintiff per the requirements of Rule 50(b) so as to allow him to "cure any deficiency in his case." *Martinez-Moll v. Levitt & Sons*, 583 F.2d at 569.

The vacation of the judgment n.o.v. poses a problem. The district court ruled on the motion for judgment n.o.v. but failed to rule on SCM's motion for a new trial. It reasoned that because it had granted defendant's motion for judgment n.o.v., it "need not pass upon ... the motion for a new trial." Federal Rule of Civil Procedure 50(c)(1) mandates otherwise:

> (1) If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

The question, therefore, is whether we should reinstate the verdict, *Hansen v. Firestone Tire and Rubber Co.*, 276 F.2d 254 (6th Cir.1960); 9 Wright and Miller, Federal Practice and Procedure § 2540 at 614 (1971 & 1983 Supp.) or remand for the trial court's determination of the motion for a new trial, *see Neely v. Martin K. Eby*

*Construction Co.,* 386 U.S. 317, 329, 87 S.Ct. 1072, 1080, 18 L.Ed.2d 75 (1967).

Defendant advanced what the district court termed a "kitchen sink full of grounds" for obtaining either a judgment n.o.v. or a new trial. On appeal, defendant presses three grounds for a new trial that were included in its original motion to the district court. It claims that the verdict was against the weight of the evidence, was contrary to the law, and was the result of "plaintiff's inflammatory, prejudicial, and irrelevant summation." The first and third grounds are plainly without merit, but the second bears consideration. The district court held that Systemized's notice to SCM of the defects in the model 1200s purchased prior to January, 1979, was untimely and that Systemized had, therefore, waived its objections as a matter of law. We cannot agree that a reseller's notice of design defects given approximately four weeks after delivery is, as a matter of law, untimely. The reasonableness of four weeks in these circumstances, Uniform Commercial Code § 1–204(2), was well within the range for evaluation by the jury. Nor should the "somewhat closer question" the district court noted was presented by the 1201s have been withdrawn from the jury. Both the questions of timeliness and specificity of notice as to the 1201s were questions of fact for the jury. It would also appear that the district court failed to evaluate the evidence in the light most favorable to the nonmoving party. *Rios v. Emperas Lineas Maritimas Argentinas,* 575 F.2d at 989. The remarks of the court at the time it was ruling on the motion indicate that it was considering the whole range of evidence on timeliness: four, five, and six weeks.

The district court was correct, however, in finding that there was no evidence indicating Systemized discharged its duty of notification under the Code as to the shipments of 1200s ordered in January and February of 1979. Because plaintiff's claim of breach of warranty on these fifteen machines was erroneously submitted to the jury, we cannot reinstate the verdict. Our only course is to remand to the district court for a determination of whether to grant a new trial or order a remittitur on plaintiff's verdict.

*The judgments on the breach of contract and antitrust claims are affirmed. The judgment n.o.v. is vacated. The case is remanded for further proceedings consistent herewith.*

No costs to either party.