PUTNAM RESOURCES, Plaintiff,

v.

Ronald M. PATEMAN, et al.,
Defendants.

Ronald M. PATEMAN, et al.,
Defendants,

v.

FRENKEL & CO., INC., Defendant.

Civ. A. Nos. 88–530B, 88–265B.

United States District Court,
D. Rhode Island.

Feb. 22, 1991.

Norman Roy Grutman, Grutman, Miller, Greenspoon & Hendler, New York City, Allen Rubine, Winograd, Shine & Zacks, P.C., Providence, R.I., for Putnam Resources, plaintiff.

James F. Campise, Marcigliano & Campise, New York City, George Vetter, Vetter & White, Providence, R.I., for Pateman, et al., defendants and third-party plaintiffs.

David P. Whitman, Hanson, Curran, Parks & Whitman, Providence, R.I., for Frenkel & Co., third-party defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

The plaintiff, Putnam Resources, Inc. (Putnam), is a limited partnership organized in Connecticut for the purpose of dealing in precious metals. Among its customers was Sammartino, Inc., a jewelry manufacturing company located in Cranston, Rhode Island. Putnam made gold available to Sammartino under three different "programs." One of the programs involved a so called "field warehouse" located in the secure area of the Sammartino premises and under the control of a company known as SLT Warehouse Company (SLT). SLT was under contract to Putnam to control the delivery of gold to Sammartino from the warehouse. Sammartino, Inc. would pay for the gold as it was sold by Sammartino.

During the Summer of 1986, Putnam asked Frenkel & Co. (Frenkel), a New York Insurance broker, to arrange for insurance on its inventory of gold, including gold at

the Sammartino field warehouse. Frenkel sought to place the insurance with a syndicate of Lloyd's of London. To deal with a Lloyd's syndicate, it is necessary to deal through a Lloyd's approved broker, in this instance J.H. Minet & Co., Ltd. (Minet). During the course of the contract negotiations, there were communications between Minet and Frenkel the effect of which was hotly contested at trial. Minet asked Frenkel to provide Putnam's insurance history to the prospective underwriters, including records for each of the preceding three years detailing Putnam's "claims recovered" and "claims outstanding." Minet also asked Frenkel to provide "any useful background information." Frenkel responded but failed to report two warehouse security failures, of which it was aware, in which precious metals of substantial value belonging to Putnam were, in one instance, lost and in another believed to be missing.

A syndicate whose principal underwriter was Ronald M. Pateman issued a policy of insurance on September 10, 1986. Initially, the policy limit was $5,000,000. It was later increased to $8,000,000. The property insured was gold owned by Putnam and located in the Sammartino field warehouse.

The Sammartino factory shut down for vacation during the week of the fourth of July holiday in 1987. There was testimony that during this vacation period substantial quantities of gold were removed from the Sammartino premises. In particular, Charles Harrison, who was employed by SLT to supervise the transfer of gold from the field warehouse at Sammartino, testified that he removed gold from the vault and placed it in a corridor at the request of Walter Sammartino, the principle owner of Sammartino, Inc.. Harrison testified that he expected that there was to be an exchange of impure gold for pure gold, as had occurred on other occasions. Harrison testified that when he went to look for the gold, it had disappeared. When the exchange gold was not received by the end of the month of July, Harrison reported the loss to SLT. Thereafter, Sammartino notified Putnam that gold was missing and Putnam filed a claim under the policy of insurance. In October, 1987, Pateman paid two million dollars to Putnam on account of the claimed loss. Following a subsequent denial of the claim, Putnam brought suit, originally in the United States District Court for the District of Connecticut. A change of venue was granted, transferring this action to the United States District Court for the District of Rhode Island.

Pateman and the other defendant underwriters (Pateman) contended that no gold was lost, that misrepresentations had been made in the course of obtaining the policy which voided the policy, and that the loss, if any, fell within the unfaithful servant exclusion of the policy, due to the actions of Charles Harrison, the SLT employee, as Putnam's agent. Pateman counterclaimed for the two million dollars paid to Putnam and brought an action against Frenkel to recover the two million dollars, alleging that Frenkel had failed to disclose material facts with intent to deceive during the contract negotiations.

After a nineteen day trial, interrogatories were submitted to the jury. The jury responded and found that Pateman was not liable to Putnam. Specifically, the jury found that Putnam had failed to carry its burden of proof, and that Pateman had proven its defenses of infidelity of Putnam's agent and nondisclosure of a material fact. On the third party claim, the jury found that Frenkel was liable to Pateman in the amount of $2,000,000. On June 29, 1990, the Court entered judgment for $2,000,000 against both Putnam and Frenkel.

Having seen its gold turn to base metal, Putnam now seeks to invoke this Court's alchemic powers under Rules 50 and 59 of the Federal Rules of Civil Procedure, seeking a judgment notwithstanding the verdict or, in the alternative, a new trial. Apparently anticipating denial of its motions, Putnam also moves for a stay of execution of judgment pending appeal and upon the posting of alternative security.

Frenkel joins Putnam in moving for a judgment N.O.V. or a new trial. In addition, Frenkel has filed a motion seeking

relief from judgment pursuant to Rule 60(b)(6).

### Motions for Judgment N.O.V.

■ Putnam's motion for a judgment notwithstanding the verdict must be denied because grounds sufficient to support the motion were not initially raised in a motion for a directed verdict. A judgment n.o.v. is a renewed motion for a directed verdict. *See* Fed.R.Civ.P. 50(b). Grounds which were not raised in a directed verdict motion are not a proper basis for overturning a jury verdict and entering a new judgment. *Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030, 1035–36 (1st Cir.1984).

■ At the close of trial, Putnam's counsel moved for a directed verdict "on the grounds with regard to the non-disclosure defense that there is total failure of proof that there was any injurious reliance by Pateman." In response to repeated questions from the Court, Putnam failed to offer any other grounds for its motion. Any other grounds were thereby waived. In its answers to interrogatories, the jury found that Putnam was not entitled to a verdict for three different reasons, two of which have nothing to do with the nondisclosure defense that was the subject of Putnam's directed verdict motion. Because Putnam has waived objection to these other grounds that support the jury's verdict, its motion for judgment notwithstanding the verdict must be denied. *Id.; Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.*, 583 F.2d 565, 568 (1st Cir.1978); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2537 at 598 (1971).

Frenkel's motion for a judgment notwithstanding the verdict is more properly before the Court. In a timely motion for a directed verdict, Frenkel raised three grounds which it now reiterates in its motion for a judgment N.O.V.. These grounds are: 1) that Pateman did not inquire as to material facts in the insurance contract negotiations and that, therefore, Frenkel was under no duty to disclose the warehouse security failures; 2) that evidence was insufficient to establish proximate cause between Frenkel's alleged omission of material facts and Pateman's damages; 3) that Pateman never tendered premiums to Putnam as a prerequisite to seeking rescission of the insurance contract. Frenkel argues that each of these grounds "could lead a reasonable person to only one conclusion," that Frenkel is entitled to a favorable judgment. *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir.1987). Because Frenkel and Putnam raise identical grounds in their motions for new trials, the issues are discussed at length in the context of those motions. Frenkel's motion for judgment notwithstanding the verdict is denied for the same reasons that its new trial motion is denied.

### Motions for New Trials

Under Rule 59 of the Federal Rules of Civil Procedure, a trial court may set aside a verdict and grant a new trial if the verdict is contrary to the clear weight of the evidence or if trial error or other factors have caused a clear miscarriage of justice. *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir.1988); *Payton v. Abbott Labs*, 780 F.2d 147, 152 (1st Cir. 1985). Putnam and Frenkel raise a multitude of arguments to support their motions for a new trial. Broadly speaking, however, these arguments fall into five categories.

First, Putnam and Frenkel argue that the jury's acceptance of the non-disclosure defense is against the weight of the evidence. Second, Putnam argues that the jury was not warranted in finding that the infidelity exclusion clause relieves Pateman of liability. Third, Putnam asserts that various erroneous evidentiary rulings prejudiced its case, preventing a jury finding that Putnam had met its burden of proof. Fourth, Putnam argues that the Court unfairly prejudiced the jury in statements made during voir dire and erred in various instructions to the jury. Fifth, Putnam argues that the jury's answers to interrogatories are inconsistent and require a new trial in the interests of justice. The Court will consider each of these objections in turn.

## A. The Non–Disclosure Defense

■ Putnam and Frenkel raise three arguments in support of their assertion that the jury's acceptance of the non-disclosure defense was against the weight of the evidence. First, the parties note that, absent fraud [1], an insured only has a duty to disclose information about which an insurer inquires. Consequently, they argue that there was no non-disclosure because Pateman did not ask for the material information before accepting the insurance risk. This argument, however, ignores undisputed evidence that Minet, Pateman's London broker, inquired about warehouse security, Putnam's insurance history and other background information in three separate telexes during the course of contract negotiations. Frenkel's responses to these telexes were conveyed to Pateman and the other Underwriters. The telexed inquiries and Frenkel's representations in response provided sufficient evidence for a jury to conclude not only that Putnam and Frenkel had a duty to disclose material facts relevant to the inquiries and representations but also that they had not responded fully or frankly.

■ Second, Putnam and Frenkel argue that the jury had insufficient evidence to decide that information was withheld from Pateman with intent to deceive. Frenkel and Putnam base this argument on the premise that Frenkel's employees had no intent to deceive when they failed to inform Pateman of two earlier warehouse security failures that involved substantial amounts of precious metals. Frenkel's employees testified that they had no intent to deceive and did not inform Pateman about these warehouse failures because the telexed requests for information from Minet asked only for "claims outstanding." Frenkel's employees testified that "claims outstanding" is a term of art in the insurance industry that refers only to active, formal insurance claims that have been submitted for payment under a valid insurance policy and which are not yet paid. Of the two warehouse failures, no formal demand for payment was made for one because Putnam decided to directly sue the company charged with managing its precious metals trading.[2] The insurance company's "contingency claims" file concerning this incident was closed without payment just days before Frenkel's communication to Pateman through the London broker. As to the second warehouse failure, Putnam's insurance carrier was notified of the incident and assigned an insurance investigator to the case. Again, however, Putnam initially made no formal demand for payment from the insurance company, but instead sought to recover directly from the principal of the field warehouse company. Later, following a demand, the insurance carrier did pay Putnam's legal expenses incurred in this effort. This happened after the Pateman policy was issued.

Juries are peculiarly adept at assessing the weight to be given to testimony. The jury was entitled to give the testimony of Frenkel's employees concerning what is an "outstanding claim" little weight given Frenkel's stake in the litigation. Given that the evidence was also contradictory concerning the insurance industry's use of the word "claim," the jury could reasonably have concluded that Frenkel intended to mislead and therefore to intentionally deceive Pateman and the other the underwriters by failing to disclose the warehouse security failures. Frenkel's own claims manager testified that the term "claim" is used loosely in the industry. In documents admitted into evidence, Frenkel employees refer to both warehouse failures as "claims." Based on this evidence and given the obvious materiality of the nondisclosed facts, the jury could reasonably conclude that Frenkel's omissions were intentional and not inadvertent.

1. Fraudulent concealment can make an insurance policy voidable even without inquiry concerning the concealed material facts by the insurer. *Lighton v. Madison–Onondaga Mut. Fire Ins. Co.,* 106 A.D.2d 892, 893, 483 N.Y.S.2d 515, 516 (App.Div.1984) (non-disclosure of a previous suspicious fire on insured's premises was properly submitted to jury despite lack of inquiry by insurer).

2. The lawsuit was brought in 1985 by Fundamental Resources, Putnam's predecessor.

■ Putnam's and Frenkel's third argument is that the jury had insufficient evidence to conclude that Minet, the London broker, would have conveyed the material information to Pateman, if such information had been disclosed. Although Pateman testified that he "wouldn't have written the risk" if he had known of the warehouse security failures, the parties argue that without evidence that Pateman would have received the information no causal link could be established between fault and injury. In excerpts from a deposition admitted into evidence, the broker at Minet adamantly refused to answer repeated questions from Pateman's attorney about whether he would have conveyed information to Pateman concerning the two warehouse security failures. Minet, however, was Putnam and Frenkel's agent in the contract negotiations and the Minet broker was an obviously hostile witness. Based on evidence that Frenkel expected and could expect Minet to convey all the information that was provided relevant to Pateman's inquiries and given that Minet did in fact relay all the meager and incomplete information that Frenkel provided, the jury was entitled to conclude that the non-disclosure caused Pateman's injury.

■ Putnam's and Frenkel's final attack on Pateman's non-disclosure defense raises a point of law. Because Pateman failed to tender back premiums paid on the policy, the parties argue that the underwriters cannot seek rescission of the contract. This argument was raised in the waning days of the trial and in Putnam's case was raised post-verdict. The parties cited no law for the proposition that the premium tender requirement must be met by an insurer who on account of the policy has already paid more than the sum of the premiums.

Not all jurisdictions recognize the premium tender requirement. *See* N.Y.Civ. Prac.L. & R. § 3004 (McKinney 1990); *Dunton v. Connecticut Fire Ins. Co.,* 371 F.2d 329, 331 (7th Cir.1967) (noting general rule that insurer need not tender back premiums "as a condition precedent to availing itself of its defense to the action on the policy"); *Benanti v. Delaware Ins. Co.,* 86 Conn. 15, 84 A. 109, 111 (1912). Others that do recognize that an insurer need not meet the requirement if a sum greater than the total premiums has already been paid to the insured. *See American Standard Ins. Co. v. Durham,* 403 N.E.2d 879, 882 (Ind.App.1980). The purpose of contract rescission is to return the parties to the pre-contract status quo. Where the status quo is already out of balance, as the jury found in this instance, due to payment made on a contract obtained by fraud, an additional tender of premiums is unnecessary. *See* 6 *Couch on Insurance* 34:35 (2d ed. 1985).

**B. The Infidelity Exclusion Clause**

As it must in order to overcome the jury's tripartite rejection of Plaintiff's contentions and to obtain a new trial, Putnam also argues that evidence was insufficient for the jury to conclude that the losses at the SLT field warehouse were caused by Putnam's wrongdoing and thus excluded from coverage under the infidelity exclusion clause of the contract. Specifically, Putnam argues that Charles Harrison, the SLT warehouse employee on site at the field warehouse was not an agent of Putnam and that, therefore, his conduct was not attributable to Putnam. Putnam also argues that Harrison's conduct did not constitute infidelity as a matter of law and that, in any case, the conduct was not a proximate cause of the loss.

■ In denying that Harrison was its agent, Putnam relies on provisions in two agreements between Putnam, Sammartino, and SLT. These documents provide that Harrison was supposed to take instructions only from SLT and that SLT was an independent contractor and Putnam's agent only for purposes of accepting collateral pledged by Sammartino to secure outstanding debt. Putnam also notes that payroll and personnel documents show that Harrison was an SLT employee. The jury, of course, was free to consider this evidence and is presumed to have done so. The jury could also consider evidence that Harrison in fact performed a host of daily tasks on

Putnam's behalf and at Putnam's direction. Harrison routinely kept track of all of Putnam's gold at the Sammartino facility, including gold that was received from Putnam and ear-marked for a "lease program" which was independent from the SLT "vault program" and not covered by the SLT bailment agreement. Harrison weighed received gold and communicated with Putnam regularly to confirm receipts and to verify the spot price of gold. Harrison billed Sammartino, collected payments and forwarded checks to Putnam. In view of this evidence, it cannot be said that the jury was unreasonable in concluding that Harrison in fact acted as Putnam's agent. *See White's Farm Dairy, Inc. v. De Laval Separator Co.*, 433 F.2d 63, 66 (1st Cir. 1970) (holding that proof of agency is a matter of fact for the jury).

■ Putnam next preposterously argues that Harrison's conduct, as a matter of law, did not constitute infidelity. Putnam notes that dishonesty is necessary to support a finding of infidelity and asserts that the evidence does not show that Harrison was more than negligent. Putnam's view is not only fickle, it is duplicitous. A complaint in another lawsuit filed by Putnam against SLT Warehouse Company reached the jury as an admission. In it, Putnam alleged that "the aforesaid conversion of Putnam's gold by defendant was done intentionally, willfully, wantonly, and in reckless disregard of Putnam's rights." It is clear that the facts of the case more closely support Putnam's original theory of the case than its current jaundiced view.

As a witness, Harrison was a paragon of contrition. Harrison testified that he allowed borrowings of gold in excess of authorized limits. Harrison was aware of consistent shortages in the vault of as much as a million dollars of gold in the months before the loss of the gold was allegedly discovered. Rather than reporting these shortages, Harrison routinely falsified warehouse receipts and shuttled gold in and out of the vault to prevent discovery during inventories. On two separate occasions on July 2nd and 3rd, 1987, Harrison assisted others in removing gold from the vault, purportedly for an exchange of "new" gold for "old" or used and impure gold. This exchange never occurred. Harrison never reported the disappearance of this gold and lied under oath when questioned about the incident. In short, a jury finding that Harrison was dishonest cannot be said to be anything else than the truth. His frankness was at once refreshing and disheartening.

■ Putnam's last argument, that Harrison's conduct was not a proximate cause of the loss of gold, is impossible to understand. Harrison was the only person capable of opening the vault in the SLT warehouse. Having found that Harrison was guilty of infidelity, it would be impossible for the jury or anyone else to find otherwise than that his conduct caused the loss.

### C. Evidentiary Rulings

Putnam argues that various evidentiary rulings prejudiced its case, preventing Putnam from carrying its burden of proving that a theft occurred at the warehouse. Given correct rulings, Putnam asserts, a rational jury could not have concluded that no gold was stolen in the incidents which occurred on July 2nd and 3rd, 1987.

First and most vigorously, Putnam argues that books and records of Sammartino, Inc. were untrustworthy and should not have been admitted into evidence. Second, Putnam argues that two letters that would have demonstrated the untrustworthiness of the Sammartino records should have been admitted. Third, Putnam argues that a letter from the defendants' attorney acknowledging the loss of gold should have been allowed into evidence.

Putnam argues that the Sammartino business records were erroneous.y admitted into evidence because the source of the documents was untrustworthy. Specifically, Putnam asserts that the records should have been excluded because Walter Sammartino, the president of Sammartino, Inc., was indicted and plead guilty to supplying false information in four invoices contained in the records. The argument is appropriate with respect to those four invoices. However, Putnam did not seek the exclu-

sion of those invoices, but rather a blanket exclusion of all of the business records of Sammartino, Inc. that Pateman sought to admit. Among the variety of documents introduced were journals and ledgers for factory and retail sales, purchase journals, disbursement journals, checks, invoices, and card files on accounts payable and receivable. Information contained in those records came from Sammartino employees who were not implicated in any criminal conduct and from outside sources. The records were introduced through Sammartino's bookkeeper and office manager of forty years who identified each exhibit and testified that each was prepared in the routine course of business at or about the time of the recorded events or transactions.

■ Evidence that some records were falsified obviously bears on the weight of the evidence but does not deny its admissibility. *See United States v. Tafoya*, 757 F.2d 1522, 1528–29 (5th Cir.), *cert. denied*, 474 U.S. 921, 106 S.Ct. 252, 88 L.Ed.2d 259 (1985); *Crompton–Richmond Co., Factors v. Briggs*, 560 F.2d 1195, 1202 n. 12 (5th Cir.1977); *United States v. Page*, 544 F.2d 982, 987 (8th Cir.1976). The jury was aware of Walter Sammartino's indictment and plea and heard that certain of Sammartino's business records were falsified. Putnam questioned the accuracy of the records in question in examination of three different witnesses. The jury was capable of giving the records such weight as it saw fit and did so.

■ Aside from the challenged records, ample evidence supported the jury's verdict that Putnam had failed to prove a loss from the SLT warehouse in July, 1987. The warehouse receipts that Putnam depended on to prove the quantities of gold present were based on information that Harrison, the SLT warehouseman, provided. Harrison, however, a paragon of born-again truth, testified that inventory inspections were inaccurate and that he regularly and intentionally misstated the quantity of gold in the vault. Similarly, holding certificates were calculated based on inaccurate

figures provided by Harrison. There was also testimony from Harrison and others that the quality of the gold in the vault was not what it was reported to be in the records. Gold was described as pitted and contaminated and when used it "didn't work right." These facts and the fact that Harrison, the employee in charge of the gold, was an admitted liar were more than enough to permit a reasonable jury to conclude that Putnam had not met its burden of proof.

■ Putnam's next objection is that the Court erroneously failed to admit as substantive evidence two letters signed by Walter Sammartino and addressed to Trend Precious Metals, a supplier of gold to Sammartino, Inc.[3] One of these letters, exhibit 155, was never offered for its substance and Putnam may not now use it for a purpose which it eschewed at trial. The other letter, exhibit 157, was denied admission as substantive evidence because it was not "kept in the course of regularly conducted business activity" and therefore did not fall under the business records exception to the hearsay rule. At trial, Sammartino's bookkeeper was able to verify Walter Sammartino's signature on the letter but stated unequivocally that she did not type the letter, had never seen the letter before, and was unfamiliar with its contents. In its brief Putnam offers nothing to warrant admission of this document as a business record and its argument fails as a result.

In its final evidentiary objection, Putnam argues that the Court should have admitted a letter from the defendants' attorney acknowledging that Putnam had 15,679.83 ounces of gold on the Sammartino premises prior to the date of the alleged theft. This letter was written in the course of settlement negotiations and its contents are therefore inadmissible under Rule 408 of the Federal Rules of Evidence.

In addition, two other distinct reasons compel a conclusion contrary to Putnam's contention. First, Putnam has failed to cite a transcript reference for the alleged

---

**3.** For purposes of this argument, Putnam is apparently willing to abjure its earlier protests against admitting documents created by Walter Sammartino.

error.[4] This circumstance is not an isolated occurrence. In its post-judgment motions, Plaintiff has fired off a volley of arguments without any concern for the accuracy of their trajectory in the hope that one may ultimately strike the target. Plaintiff has not defined the area of its bombardment or given attention to the quality of the ordnance employed in the attack. In short, Plaintiff has offered scant assistance to the Court in resolving the myriad of issues raised.

On a motion for a new trial, courts are not obliged to rummage through thousands of pages of transcript in search of trial errors that were not properly cited by the litigants. Nor can a trial judge be expected to remember and evaluate evidentiary rulings that occurred months previously in the course of a nineteen day trial. Putnam's argument must, therefore, fail. *Cf. Batistini v. Aquino,* 890 F.2d 535, 538–39 (1st Cir.1989); *Muniz Ramirez v. Puerto Rico Fire Servs.,* 757 F.2d 1357, 1358 (1st Cir.1985).

The Court must also reject this argument because it was not raised in Putnam's original motion for a new trial. Putnam filed its original motion for a new trial on July 3, 1990, the same day that judgment was entered. In an order entered July 26, 1990, the Court granted Putnam an extension of time to file a brief in support of its motion. The Court did not and could not grant Putnam leave to refile its motion. Motions for new trials must be filed not later than ten days following the entry of judgment. Fed.R.Civ.P. 59(b); *United States v. Lema,* 909 F.2d 561, 565 (1st Cir.1990) (district court may not extend time for filing new trial motion). Attempted amendments to motions may also be denied as untimely if they are filed beyond the ten day period. *Conrad v. Graf Bros., Inc.,* 412 F.2d 135, 137 (1st Cir.), *cert. denied,* 396 U.S. 902, 90 S.Ct. 215, 24 L.Ed.2d 178 (1969); *Pate v. Seaboard R.R.,* 819 F.2d 1074, 1085 (11th Cir.1987); *Dotson v. Clark Equip. Co.,* 805 F.2d 1225, 1228 (5th Cir.1986). Putnam's amended motion[5] objecting to the exclusion of the letter was filed more than ten days after entry of judgment. It is, therefore, denied.

### D. Voir Dire and Jury Instructions

Putnam argues that a new trial is warranted because the Court's questioning during voir dire prejudiced the jury. In addition, Putnam argues that the jury was wrongly instructed to draw no inference concerning the trustworthiness of the Sammartino business records from Fifth Amendment pleas by two Sammartino employees. Finally, Putnam asserts in its motion for a new trial, without any explanation in its brief or at oral argument, that the jury was wrongly instructed on the elements of fraud.

During voir dire, the Court questioned a number of veniremen who had seen newspaper or television reports which may have made reference to some of the underlying factual issues in the case. The Court told a number of these veniremen that the fact that any gold was missing at all was a disputed issue in the case. The Court also asked these veniremen whether news reports describing a theft would influence them. Putnam asserts that this questioning was error because the fact that gold was missing was not a disputed issue. On this point, Putnam is wrong. Pateman and the other underwriters argued at trial and continue to maintain that no gold was in fact stolen. There was no misstatement of any issue to potential jurors.

---

4. Putnam originally filed its motion for judgment n.o.v. or a new trial without any accompanying memorandum of law, in violation of Local Rule 12. By order, on July 26, 1990, the Court gave Putnam twenty days to submit a memorandum or have its motion denied without a hearing. Putnam's memorandum submitted pursuant to this order contained no transcript references at all. Putnam provided the Court with a new copy of its memorandum with its incomplete references only after oral argument and after the Court's repeated request.

5. Putnam did not term its second motion an amended motion or call the additional grounds contained therein to the Court's attention. The second motion, identical to the first except for the additional grounds asserted, was submitted with Putnam's brief and was, accordingly, not recorded on the docket sheet.

Furthermore, there is a measure of latitude permitted in questioning veniremen. *Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976); *Eastern Renovating Corp. v. Roman Catholic Bishop of Springfield*, 554 F.2d 4, 8 (1st Cir.1977). The questioning at issue was intended only to determine whether veniremen had accepted news accounts of crucial events as fact. Such questioning is clearly within permissible bounds. *See United States v. Gullion*, 575 F.2d 26, 30–31 (1st Cir.1978). For these reasons, Putnam's argument fails.

Putnam next argues that the Court erred in instructing jurors not to draw any inference from the Fifth Amendment pleas of Anita Sammartino and Nina Sammartino Birmingham, two employees of Sammartino, Inc.. Putnam called these witnesses, presumably to establish the fact that employees at Sammartino, Inc. were involved in a theft of gold at the field warehouse. The Court permitted the witnesses to testify but instructed the jury to draw no inferences from their invocation of the privilege. Putnam objected to this instruction at the time but did not then cite any law in support of its objection. Putnam still cites no relevant law, but in light of further research by the Court, the Court *sua sponte* concludes that its instruction was indeed incorrect.

■ The Constitution permits a jury to draw adverse inferences against a party in a civil suit based on its claim of Fifth Amendment privilege. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976). Likewise, constitutional concerns are not implicated when inferences are drawn from Fifth Amendment invocations by non-party witnesses. *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 521 (8th Cir.) ("The policies supporting the Fifth Amendment apply with even less force when a non-party witness testifies in a civil proceeding and thus, the Amendment should not work to preclude an adverse inference in this situa-

tion."), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *RAD Servs., Inc. v. Aetna Casualty and Surety Co.*, 808 F.2d 271, 275 (3d Cir.1986). The constitutional inquiry, however, does not settle the matter. Rule 501 of the Federal Rules of Evidence provides that privileges are to be governed by federal common law principles, except with regard to issues where state law provides the rule of decision.[6] This rule was intended to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis." *Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980). Courts and commentators have generally favored allowing the drawing of inferences from claims of privilege by non-party witnesses. *See Rosebud*, 733 F.2d at 522 (allowing party to call a witness who has made known intention to invoke Fifth Amendment); *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1480 (8th Cir.1987) (same); *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir.1983) (claims of privilege by non-party were admissible, competent evidence); *RAD Servs.*, 808 F.2d at 277 (same); Heidt, *The Conjurer's Circle: The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1187–88 (1982) (arguing for allowing inference drawn from exercise of privilege by a defendant's employees). *But see Brink's Inc.*, 717 F.2d at 716 (Winter, J., dissenting) (allowing inference "inevitably invites jurors to give evidentiary weight to questions rather than answers"); *Lionti v. Lloyd's Ins. Co.*, 709 F.2d 237, 244–47 (3d Cir.) (Stern, J., dissenting) (arguing against drawing inference from non-party invocation), *cert. denied*, 464 U.S. 995, 104 S.Ct. 490, 78 L.Ed.2d 685 (1983); *E.H. Boerth Co. v. Lad Properties*, 82 F.R.D. 635, 645 (D.Minn.1979) (allowing adverse inference against witness' employer but not against unrelated party); Note, *Adverse Inferences Based on Non–Party Invocations: The Real Magic Trick in Fifth Amendment Civil Cases*, 60 Notre

---

**6.** In enacting Rule 501, Congress rejected a set of more specific proposed rules, including a rule that would have uniformly prevented the drawing of inferences from claims of privilege. *Brink's Inc. v. City of New York*, 717 F.2d 700, 708 (2d Cir.1983).

Dame L.Rev. 370 (1985) (arguing against allowing inference).

The First Circuit Court of Appeals has not addressed the issue in a civil case. However, In *United States v. Kaplan*, 832 F.2d 676, 684 (1st Cir.1987), *cert. denied*, 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988), the First Circuit Court of Appeals held that a district court's refusal to permit a criminal defendant to force a government witness to assert his fifth amendment privilege before the jury was error. In *Kaplan*, the defendant sought to impeach a government witness by cross-examining him concerning his use of illegal drugs. During *voir dire*, the witness invoked his Fifth Amendment privilege in response to defendant's questions on the subject. The trial court ruled that cross-examination before the jury should be limited to questions that would not cause the witness to invoke the privilege in order to "prevent questions 'to which there would have been no answer.'" *Id.* at 683. On appeal, the First Circuit Court of Appeals held that this was error, reasoning that the defendant was entitled to the benefit of the jury's reasonable inference that the witness' observation or memory was impaired due to drug use at times relevant to his testimony. *Id.* at 684–85. The Court of Appeals indicated, however, that the result might be different in a situation where a witness was called to testify on direct examination solely for the purpose of invoking the privilege before the jury. *Id.* at 684. Faced with this situation, the Court noted, a trial court may use discretion to refuse to allow the witness to take the stand. The Court reasoned that preventing invocation before the jury could be necessary to avoid "a disproportionate, probative impact on the mind of the average juror." *Id.*

██ In applying *Kaplan* to the facts before the Court, the decision as to admissibility ultimately rests on whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See id.; see also Brink's Inc.*, 717 F.2d at 710; Fed.R.Evid. 403. In this case, as Putnam asserts, the exercise of privilege by Sammartino employees would support an inference that Sammartino, Inc. was involved in questionable acts at about the time of the alleged gold theft. Because Putnam was attempting to prove that a theft occurred, the invocation of the privilege would have some probative value. Because the witnesses were unrelated to the parties in the action, the danger of unfair prejudice to the parties was minimal. The Court is, therefore, left with the conviction that its instruction to the jury not to draw inferences from the two Sammartino employees' claims of privilege was indeed error. The error is, however, not fatal. The erroneous instruction was harmless.

██ Trial error requires a new trial only when the error results in a clear miscarriage of justice. *Payton v. Abbott Labs*, 780 F.2d 147, 152 (1st Cir.1985). Where error excludes evidence that is duplicative, a new trial is not warranted. *See Kaplan*, 832 F.2d at 685 (holding error in excluding evidence harmless given presence of other evidence). In this case, the jury heard direct evidence that the president of Sammartino, Inc. was indicted and plead guilty to criminal charges relating to fraudulent invoices. In addition, the jury heard ample evidence of errors and misstatements in records kept by Sammartino employees. Any inference that the jury could draw from invocations of privilege by Sammartino employees could only supplement other direct evidence of wrongdoing by Sammartino, Inc..

The error is also harmless because any inference drawn from the Fifth Amendment pleas would merely establish support for what was an undisputed fact, that Sammartino, Inc. was involved in criminal acts. Pateman never contested the fact that Sammartino, Inc. was involved in wrongdoing and did not object to the admission of documents evidencing Mr. Sammartino's indictment and plea. Pateman also extensively questioned Nina Sammartino and Anita Sammartino Birmingham, repeatedly eliciting invocations of privilege. Thus, the jury instruction not to draw inferences from the claims of privilege cuts both ways, affecting claims of privilege elicited both on direct and cross-examination.

The Court's erroneous instruction was also not without some benefit to Putnam. One of the factual issues presented to the jury was whether the expected quantity of gold was on the Sammartino premises in the first place. Evidence that Sammartino employees were unbelievable could hardly help Putnam as Putnam was, in part, dependent on Sammartino records to prove the fact of the theft. Plaintiff was, therefore, both beneficiary and victim of the Court's ruling. Under these circumstances, the Court's instruction can only be seen as harmless error.

Putnam's last argument is that the Court wrongly instructed the jury on the elements of fraud and erred in failing to charge the jury that fraud is not presumed. Putnam failed to mention these grounds for a new trial in its brief or in oral argument and the grounds are waived. *Chang v. University of Rhode Island*, 606 F.Supp. 1161, 1270 (D.R.I.1985) (claim neither briefed nor argued is waived); *cf. U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir.) (matters not briefed or argued on appeal are waived), *cert. denied*, —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *Denny v. Westfield State College*, 880 F.2d 1465, 1473–74 (1st Cir.1989) (same).

### E. Jury Interrogatories

In its final arguments, Putnam asserts that the judgment against it should be annulled or in the alternative that a new trial should be granted due to inconsistency in the verdict. The argument for annulling the judgment was extensively briefed and argued in the form of a motion opposing entry of judgment. The Court dealt at length with the issues involved in an opinion and order entering judgment on July 26, 1990 (unpublished). Putnam failed to move for reconsideration of that order. Putnam also failed to move for amendment within ten days of the entry of judgment as required in the Rules. Fed.R.Civ.P. 59(e). The Court will, therefore, not reconsider its July 26th opinion and will not amend the judgment.

■■■■ Inconsistency in a jury's verdict, if proven, would normally be a ground

for a new trial. Fed.R.Civ.P. 49(b); *see, e.g., Saunders v. Rhode Island*, 731 F.2d 81, 84 (1st Cir.1984). In this case, as the Court explained in its July 26th opinion, the jury's responses to interrogatories were not inconsistent. The Court need not restate the reasons for this conclusion, however, because Putnam failed to raise the ground in its original motion for a new trial. Putnam raised inconsistency in the jury's verdict as a ground for a new trial only in its brief filed more than ten days after the verdict was entered. A district court may not entertain an untimely motion for a new trial. *United States v. Lema*, 909 F.2d 561, 565 (1st Cir.1990) ("district court is without discretion to grant a motion for a new trial that is not timely filed"). Even if the ground were asserted as a properly filed but untimely amendment to the new trial motion, the Court could refuse to consider it. *Conrad v. Graf Bros., Inc.*, 412 F.2d 135, 137 (1st Cir.), *cert. denied*, 396 U.S. 902, 90 S.Ct. 215, 24 L.Ed.2d 178 (1969); *Pate v. Seaboard R.R.*, 819 F.2d 1074, 1085 (11th Cir. 1987); *Dotson v. Clark Equip. Co.*, 805 F.2d 1225, 1228 (5th Cir.1986); *Arkwright Mut. Ins. Co. v. Philadelphia Elec. Co.*, 427 F.2d 1273, 1275–76 (3d Cir.1970); *see generally* 6A Moore, *Federal Practice* ¶ 59.09[2] at 230 (1989). Where, as here, the new ground was not even asserted in a formal amendment, it must be rejected out of hand. To decide otherwise would unfairly disadvantage the plaintiff who is entitled to rely on papers properly filed.

Having come to the end of Putnam's and Frenkel's arguments for a new trial and found them wanting the motions for a new trial are denied.

### Rule 60(b)(6) Motion

Under Rule 60(b)(6), Frenkel has filed a motion seeking to vacate the judgment against it, or in the alternative, to require that Pateman should first attempt to collect judgment against Putnam before proceeding against Frenkel.

■■■■ Rule 60(b)(6) affords an avenue for seeking relief from final judgments or orders. Where post-judgment motions are

pending and the judgment has not been certified as a final judgment, Rule 60(b) is inapplicable. *Farr Man & Co. v. M/V Rozita,* 903 F.2d 871, 874–75 (1st Cir.1990). The judgment against Frenkel, of course, is not yet final. Thus, as a technical matter, Frenkel's motion is not properly before the Court. Viewed as a Rule 60 motion, the request for relief is premature. Viewed alternatively as a motion to alter or amend the judgment, the petition is out-of-time. Fed.R.Civ.P. 59(e). However, "not every motion must fit within some neat pigeonhole." *Jusino v. Zayas,* 875 F.2d 986, 989 n. 3 (1st Cir.1989). The adoption of the Rules has not completely displaced a trial court's inherent power to correct interlocutory decrees. *Id.; Farr Man,* 903 F.2d at 874–75 (district court has discretion to consider issues raised in premature Rule 60 motion). Where, as here, the parties have extensively briefed the motion and deference to form would unreasonably delay a decision to the detriment of all parties, the issue will be decided.

■ Frenkel raises two arguments. First, Frenkel notes that Pateman's two million dollar judgment compensates for money paid to Putnam on account of the invalid insurance claim. Frenkel argues that Putnam rather than Frenkel should be made to satisfy this judgment to prevent Putnam's unjust enrichment. Frenkel's point might be well taken if the Court were considering only the equities between Frenkel and Putnam. Frenkel, however, is not seeking relief against Putnam but is asking the Court to limit Pateman's options for recovering its judgment. The jury found that Putnam and Frenkel were each liable to Pateman for the two million dollar loss. Pateman is entitled to collect this judgment from either party as it chooses.

■ Frenkel's second argument is that evidence in Frenkel's possession, of which it was not aware at the time of trial, requires vacation of the judgment in the interests of justice. More specifically, Frenkel asserts that Pateman accepted premium payments in February and May of 1988 after Pateman's complaint seeking rescission of the policy was filed. Frenkel argues that, by accepting premiums, Pateman waived the grounds for rescission. Frenkel's vice-president attests that evidence of the acceptance of premiums was not available at the time of trial because the documents were discovered in Frenkel's files sometime in December, 1990, approximately nine months after the close of the trial.

Newly discovered evidence may be grounds for setting aside a judgment only if, in the exercise of due diligence, it could not have been discovered in time to move for a new trial. Fed.R.Civ.P. 60(b)(2). Accepting that Frenkel was unaware of this evidence at the time of trial, Frenkel does not explain why the evidence in its possession was undiscoverable. Such a showing of due diligence is necessary before new evidence can warrant setting aside a verdict. *See United States v. Potamkin Cadillac Corp.,* 697 F.2d 491, 493 (2d Cir.), *cert. denied,* 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983). As a rule, evidence in the possession of the moving party is always discoverable through due diligence. *Taylor v. Texgas Corp.,* 831 F.2d 255, 259 (11th Cir.1987); *Coastal Transfer Co. v. Toyota Motor Sales,* 833 F.2d 208, 212 (9th Cir.1987); *see D. Federico Co. v. New Bedford Redevelopment Auth.,* 723 F.2d 122, 130 (1st Cir.1983). The rule is certainly applicable where the records were known to employees in Frenkel's accounting department.

In conclusion, none of Putnam's or Frenkel's arguments pan out. Putnam's and Frenkel's motions for judgments notwithstanding the verdict and for new trials are each denied. Frenkel's Rule 60(b) motion to vacate or amend the judgment is denied. Putnam's motion for a stay of execution pending appeal is granted conditioned upon satisfaction of the requirements for the posting of a bond as set forth in Local Rules 37 and 38.